[No. S085091. May 14, 2001.]

HOECHST CELANESE CORPORATION, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

COUNSEL

Morrison & Foerster, Eric J. Coffill, Carley A. Roberts and Lisa R. Brenner for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Lawrence K. Keethe and George C. Spanos, Deputy Attorneys General, for Defendant and Respondent.

Paull Mines and Anne E. Miller for Multistate Tax Commission as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**BROWN, J.**—States have long struggled to devise an equitable and constitutional method for taxing corporations that do business in multiple states and countries. Like many other states, California has adopted the Uniform Division of Income for Tax Purposes Act (7A pt. 1 West's U. Laws Ann. (1999) U. Div. of Income for Tax Purposes Act, § 1 et seq., p. 361) (UDITPA) in an attempt to resolve this dilemma (see Rev. & Tax. Code, §§ 25120-25141).[1] Under this scheme of taxation, all taxpayer income is divided into business or nonbusiness income. Business income is apportionable to each state using a three-factor formula. Nonbusiness income is allocable only to the taxpayer's commercial domicile. In this case, we consider whether a reversion of surplus pension plan assets is taxable by California as apportionable business income. We conclude that it is.

### FACTUAL BACKGROUND

Hoechst Celanese Corporation (Hoechst), formerly Celanese Corporation, is a Delaware corporation with its principal place of business in New Jersey and its commercial domicile in New York. It manufactures and sells a diversified line of chemicals, fibers and specialty products. Since the late 1960's, Hoechst has conducted business operations in California and filed California franchise tax returns.

In 1947, Hoechst created its first pension plan. Since then, Hoechst's pension plans have undergone numerous changes. For example, the original pension plan required contributions from both Hoechst and its participating employees. In 1969, however, the plan became noncontributory, and only Hoechst had to make contributions. Despite the constant evolution of these plans, their purpose has remained the same. Hoechst has created and maintained these plans "for the general benefit of its employees" in an effort to "retain its current employees and to attract other qualified employees."

The version of the pension plan at issue here was known as the Celanese Retirement Income Plan (CRIP I), and was subject to the terms of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.) (ERISA). CRIP I dated back to the original 1947 plan and resulted from the merger in 1982 of several pension plans created and maintained by Hoechst and its controlled subsidiaries. It was a qualified plan under Internal Revenue Code section 401(a) (26 U.S.C. § 401(a)) and covered both active

---

[1]All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

and retired employees. Under the terms of CRIP I, each plan member only had a "nonforfeitable right" to a predefined level of benefits. (*Hughes Aircraft Co. v. Jacobson* (1999) 525 U.S. 432, 440 [119 S.Ct. 755, 761-762, 142 L.Ed.2d 881] (*Hughes Aircraft*).)

In conjunction with CRIP I, Hoechst created and maintained a trust known as the Celanese Retirement Income Plan Trust (CRIP Trust I). The trust was tax exempt, and Chase Manhattan Bank acted as the trustee. To fund CRIP I, Hoechst made periodic contributions to the CRIP Trust I, and the trust invested these contributions in order to ensure adequate funding for the pension plan. These contributions discharged Hoechst's financial obligations and liabilities to CRIP I subject to any limitations imposed by ERISA. As permitted by law, Hoechst claimed tax deductions for these contributions on its federal and California tax returns. Any surplus assets in excess of those necessary to meet any obligations and liabilities owed under ERISA and CRIP I (surplus pension plan assets) were used to reduce future contributions by Hoechst to the CRIP Trust I and were not used to increase any benefits provided under the plan.

Because the CRIP Trust I held the pension plan assets, Hoechst did not own or hold legal title to these assets and could not use these assets to fund any of its corporate activities. Hoechst, however, retained an interest in any surplus pension plan assets. These surplus assets would revert to Hoechst *only* upon termination of the plan and satisfaction of all benefits and liabilities owed under CRIP I and ERISA. Until such a reversion, none of the pension plan assets, including any contributions or capital gains, were taxable as Hoechst's income.

Even though Hoechst did not hold legal title to the pension plan assets, it did have some control over them through its power over CRIP I and the CRIP Trust I and their predecessors. For example, Hoechst had the power to amend or discontinue the pension plans at any time, subject to ERISA limitations. The board of directors of Hoechst also had the power to appoint and replace the trustees of the pension plan assets at any time—a power that it exercised on numerous occasions.

Hoechst also retained the power to administer its pension plans, including the power to prescribe procedures to follow in obtaining evidence necessary to establish the right of any person to payments under the plans, to interpret the terms of the plans, to prescribe procedures for determining and recording the periods for calculating benefits, and to determine the right of any person to benefits under the plans. To exercise these powers, Hoechst created an

administrative committee composed of Hoechst employees, including corporate officers. Known as the Employee Benefits Administration Committee, the committee handled all paperwork for the plans, determined eligibility for benefits and considered requests for increases in benefits. The committee met in either New York or North Carolina three to six times a year on an irregular basis, depending on the rate that applications accumulated.

Hoechst also created a separate committee responsible for the supervision and review of the financial operation of its pension plans and trusts. The Celanese Pension Plan Investment Committee was comprised of Hoechst's chief financial officer, some of its vice-presidents, its controller and an individual from its human resources department. The committee established, supervised and reviewed the funding and investment policies of the plans and trusts and appointed the investment fund managers who determined the actual investments made by the plans and trusts. Although the committee did not control the specific investments chosen by the fund managers, it had the power to change fund managers and guide their overall investment strategy. On many occasions, Hoechst exercised this power and replaced these fund managers for various reasons, including inadequate performance. For example, in 1978, the committee "drastically revised" the investment strategy of its pension plan and "introduced new managers with a different perspective on their mission."

Due to years of wise investments, the CRIP Trust I accumulated more assets than necessary to fund the defined benefits owed to plan members under CRIP I and ERISA. In 1983, Hoechst decided to recapture these surplus assets in order to preclude their use in a takeover bid. To recapture the surplus assets, Hoechst divided CRIP I into two separate plans with essentially the same provisions as CRIP I. The newly created Celanese Retirement Income Plan (CRIP II) covered active employees, and the Celanese Retirement Security Plan (CRSP) covered retired employees. Like their predecessor, both plans were qualified benefit plans under Internal Revenue Code section 401(a).

Concurrent with its division of CRIP I, Hoechst divided the CRIP Trust I into two separate trusts. The Celanese Retirement Income Plan Trust (CRIP Trust II) funded the newly created CRIP II, while the Celanese Retirement Security Plan Trust (CRSP Trust) funded the newly created CRSP. As part of the split-up, Hoechst allocated all assets of the CRIP Trust I between the CRIP Trust II and the CRSP Trust. In making this allocation, Hoechst made sure that all benefits owed to CRIP II and CRSP members were fully funded as required under the terms of CRIP I and ERISA.

Using the funds allocated to the CRSP Trust, Hoechst purchased annuities to provide the benefits owed to its retirees. Hoechst then terminated both CRSP and the CRSP Trust in 1985. Upon termination, all surplus assets of that plan and trust reverted to Hoechst. This surplus totaled approximately $388.8 million. After the reversion, Hoechst placed these surplus pension plan assets in its general fund to be used for general corporate purposes.

As part of its 1985 federal tax returns, Hoechst reported the income from the reversion as "miscellaneous income." Hoechst also reported the income from the reversion as "taxable income of the business" in its 1985 New York tax return, and paid New York state income tax on a small percentage of this income.[2] In its 1985 California tax return, however, Hoechst did not apportion any part of the reverted income to California. Consequently, the state Franchise Tax Board (Board) issued a "Notice of Additional Tax Proposed to Be Assessed for 1985" and proposed to impose an additional franchise tax of $292,142 plus interest based on the income from the reversion.

Hoechst filed a timely protest. The Board denied the protest and affirmed the proposed assessment in its entirety. Hoechst then appealed to the State Board of Equalization (SBE). Citing *Appeal of Borden, Inc.* (Feb. 3, 1977) (1971-1978 Transfer Binder) Cal.Tax Rptr. (CCH) paragraph 205-515, page 14,897-57 (*Borden*), and *Appeal of Kroehler Manufacturing Co.* (Apr. 6, 1977) (1971-1978 Transfer Binder) Cal.Tax Rptr. (CCH) paragraph 205-646, page 14,897-122 (*Kroehler*), the SBE held that: (1) the definition of "business income" in subdivision (a) of section 25120 created both a transactional and a functional test; and (2) income from the reversion was business income under the functional test. Thus, the reverted income was apportionable and subject to taxation in California. The SBE also found the tax assessment constitutional under the operational purpose test enunciated in *Allied-Signal, Inc. v. Director, Div. of Taxation* (1992) 504 U.S. 768, 778 [112 S.Ct. 2251, 2258, 119 L.Ed.2d 533] (*Allied-Signal*).

Hoechst then filed a timely claim for refund with the Board. As part of the claim, Hoechst attached a check for $715,791.35—which covered the original assessment plus interest. In the claim, Hoechst asked for a full refund, alleging that the income from the reversion did not constitute business income under section 25120. Hoechst further argued that apportionment of the income from the reversion to California violated the due process and commerce clauses of the United States Constitution.

After the Board denied the claim, Hoechst filed a complaint for refund of taxes with the superior court. After a hearing, the court ruled in favor of the

---

[2] New York has not adopted the UDITPA.

Board. Specifically, the court found that: (1) the statutory definition of "business income" established both a transactional and a functional test; (2) the income from the reversion was apportionable business income subject to taxation in California under the functional test; and (3) taxation of the income from the reversion by California did not violate the due process and commerce clauses of the United States Constitution.

Hoechst appealed, and the Court of Appeal reversed. Although the court applied both a transactional and functional test, it concluded that the reversion did not satisfy either test. First, the court found that the reversion did not meet the transactional test because the reversion was an extraordinary event that did not occur in the regular course of Hoechst's trade or business. Second, the court found that the reversion failed the functional test because Hoechst did not own or hold title to the pension plan assets that generated the income. Thus, the income from the reversion was nonbusiness income— and not business income—and was only subject to taxation in Hoechst's commercial domicile, New York.

We granted review to determine whether: (1) income from a reversion of surplus pension plan assets constitutes business income apportionable to California; and (2) subjecting income from a reversion to taxation in California violates the federal due process and commerce clauses.

DISCUSSION

I

■ Pursuant to "the unitary business principle," a state may "tax a corporation on an apportionable share of the multistate business carried on in part in the taxing State." (*Allied-Signal, supra*, 504 U.S. at p. 778 [112 S.Ct. at p. 2258].) California employs this "'unitary business' principle and formula apportionment in applying [its franchise] tax to corporations doing business both inside and outside the State." (*Container Corp. v. Franchise Tax Bd.* (1983) 463 U.S. 159, 162-163 [103 S.Ct. 2933, 2939, 77 L.Ed.2d 545] (*Container Corp.*).) Under the "unitary business/formula apportionment method," a state "calculates the local tax base by first defining the scope of the 'unitary business' of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that 'unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction." (*Id.* at p. 165 [103 S.Ct. at p. 2940].) Like many other states that use this method of taxation, California has adopted the UDITPA almost verbatim. (*Container Corp.*, at p. 165 [103 S.Ct. at p. 2940]; § 25120 et seq.)

Originally promulgated by the National Conference of Commissioners on Uniform State Laws (Commissioners) in 1957, the UDITPA has two main objectives: "(1) to promote uniformity in allocation practices among the 38 states which impose taxes on or measured by the income of corporations, and (2) to relieve the pressure for congressional legislation in this field." (Keesling & Warren, *California's Uniform Division of Income for Tax Purposes Act* (1967) 15 UCLA L.Rev. 156, 156 (Keesling & Warren).) Initially, the UDITPA received a tepid response as few states adopted it. In 1965, however, Congress proposed comprehensive legislation regulating state taxation of interstate commerce. Spurred by the specter of congressional intervention, many states, including California, adopted the UDITPA. (See Peters, *The Distinction Between Business Income and Nonbusiness Income* (1973) 25 So.Cal. Tax Inst. 251, 279 (Peters).) Currently, 22 states plus the District of Columbia have adopted the UDITPA.[3] In addition, some states have modeled their corporate tax scheme after the UDITPA. (See, e.g., *Polaroid Corp. v. Offerman* (1998) 349 N.C. 290 [507 S.E.2d 284, 294] (*Polaroid*) [North Carolina's "Corporate Income Tax Act is modeled after [the] UDITPA"]; *Kroger Co. v. Dept. of Revenue* (1996) 284 Ill.App.3d 473 [220 Ill.Dec. 566, 673 N.E.2d 710, 714] (*Kroger*) [the Illinois Income Tax Act "was modeled after the UDITPA"].)

California's Uniform Division of Income for Tax Purposes Act (California UDITPA) mirrors the UDITPA. (Compare §§ 25120-25141 with 7A pt. 1 West's U. Laws Ann., *supra*, UDIPTA, §§ 1-22, pp. 361-403.) Like the UDITPA, the California UDITPA divides all corporate income into two categories—business income and nonbusiness income—and uses the UDITPA definition of these categories. (§ 25120.) " 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a).) " 'Nonbusiness income' means all income other than business income." (§ 25120, subd. (d).) All business income is "apportioned to this state" through a formula based on the property, sales and payroll of the taxpayer. (§ 25128.)[4] In contrast, nonbusiness income is generally "allocated in full to the state in which the taxpayer is domiciled." (*Robert Half Internat., Inc. v. Franchise Tax Bd.* (1998) 66 Cal.App.4th 1020,

---

[3]These states are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Kansas, Kentucky, Maine, Michigan, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Texas, Utah and Washington. (7A pt. 1 West's U. Laws Ann. (2000 supp.) UDITPA, note, p. 13.)

[4]Since 1993, the Legislature has amended the original apportionment formula—which used to be identical to the formula used in the UDITPA. (Compare § 25128 with Stats. 1966, ch. 2, § 7, p. 179.) The present formula, however, is still based on the property, sales and payroll of the taxpayer. (See § 25128.)

1023 [78 Cal.Rptr.2d 453] (*Robert Half*).) The tax treatment of corporate income therefore depends on its classification as business or nonbusiness income.

Because section 25120 defines "nonbusiness income" in relation to business income, the definition of "business income" is the key to determining whether corporate income is apportionable or allocable. ■ To construe this definition, we apply the well-established rules of statutory construction and seek to " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727] (*Wilcox*), quoting *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) As always, we begin with the words of a statute and give these words their ordinary meaning. (*Wilcox*, at p. 977.) If the statutory language is clear and unambiguous, then we need go no further. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If, however, the language is susceptible to more than one reasonable interpretation, then we look to "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) Where the Legislature adopts a uniform act, the history surrounding the creation and adoption of that act is also relevant.[5] (See *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 16-19 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*).)

In the instant case, Hoechst contends the statutory definition of "business income" creates a single transactional test, and the 1985 reversion of surplus pension plan assets does not satisfy this test or any other test. Thus, the

[5]In three separate requests for judicial notice, the Board asked the court to take judicial notice of: (1) a bill analysis and fiscal impact report submitted by the New Mexico Taxation and Revenue Department in connection with New Mexico House Bill No. 349 (1999 Reg. Sess.); (2) a transcript of the January 12, 1996, hearing of the California Assembly Committee on Taxation; (3) the 1966 reprinting of the model UDITPA issued by the National Conference of Commissioners on Uniform State Laws; (4) the legislative history of Assembly Bill No. 11 (1966 Reg. Sess.), which became the California UDITPA; (5) a January 7, 1966 memorandum from Allison Dunham, the Executive Director of the National Conference of Commissioners on Uniform State Laws, to the Special Committee on UDITPA; and (6) a January 21, 1966 memorandum from William J. Pierce, a commissioner of the National Conference of Commissioners on Uniform State Laws, to the Special Committee on UDITPA. In addition, Hoechst asked the court to take judicial notice of a January 14, 1966 memorandum from Donald H. Burnett to R.R. Bullivant, Chairman of the Special Subcommittee on UDITPA. We hereby grant these requests. (Evid. Code, § 452, subd. (h).)

income from the reversion is nonbusiness income that is only taxable by Hoechst's commercial domicile, New York. The Board counters that the definition establishes both a transactional and functional test, and the reversion meets both tests. Thus, the reverted assets are apportionable to California. As explained below, we conclude that the statutory definition establishes separate transactional and functional tests for business income and that the reversion satisfies *only* the functional test. Therefore, the income from the reversion is apportionable business income.

### A. The Business Income Tests

Subdivision (a) of section 25120 states: " 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." Thus, the statutory definition of "business income" consists of two clauses joined together by the conjunction and predicate, "and includes." (*Ibid.*) In interpreting this language, all courts agree that the first clause establishes a transactional test. Some courts have, however, construed the second clause as a separate functional test for business income. (*Uniroyal Tire Co. v. Dept. of Finance* (Ala. 2000) 779 So.2d 227, 230 (*Uniroyal Tire*).) Under this construction, corporate income is business income if it satisfies either the transactional or functional test. (*Ibid.*) Other courts have rejected this approach and construed the two clauses as a single transactional test. Under this construction, the second clause modifies the first clause and merely exemplifies "what fits within the definition." (*Polaroid, supra,* 507 S.E.2d at p. 290.) Not surprisingly, Hoechst contends the statutory definition of business income establishes only a transactional test, while the Board contends the definition establishes both a transactional and functional test. We agree with the Board.

We initially note that the statutory language is ambiguous and reasonably susceptible to either interpretation. On the one hand, the grammatical structure of the business income definition arguably creates both a transactional and functional test. "Business income" is the subject of the sentence. (§ 25120, subd. (a).) Two predicate clauses containing different verbs, objects and prepositional phrases and separated by a conjunction follow this subject. As such, the definition arguably contains a "compound predicate" that states two independent definitions of business income. (*Kroger, supra,* 673 N.E.2d at p. 713.) In other words, "the statute could grammatically be read as stating: 'Business income means income arising from transactions

and activity in the regular course of the corporation's trade or business, and [business income] includes income from tangible and intangible property . . . .' " (*Polaroid, supra,* 507 S.E.2d at p. 290.)

Such an interpretation accords with the different language used in the first and second clauses. The first clause focuses on "transactions and activity" and their relationship to "the regular course of the taxpayer's trade or business." (§ 25120, subd. (a).) In contrast, the second clause focuses on "property" and its relationship to "the taxpayer's regular trade or business operations." (*Ibid.*) The creation of two separate predicate clauses with different verbs, objects and prepositional phrases strongly suggests that "the second clause contains a definition distinct from that set forth in the first." (*Polaroid, supra,* 507 S.E.2d at p. 291.) The apparent expansion of "the definition of business income" by the second clause bolsters such a conclusion because a broader definition can hardly exemplify a narrower definition. (*Kroger, supra,* 673 N.E.2d at p. 713.)

■ On the other hand, the addition of the word "includes" after the conjunction linking the two clauses suggests that the second clause is a subset of the first clause under the last antecedent doctrine. (See § 25120, subd. (a).) According to this doctrine, " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191], quoting *Board of Port Commrs. v. Williams* (1937) 9 Cal.2d 381, 389 [70 P.2d 918].) Arguably, the word "includes" makes the second clause a qualifying clause that modifies the first clause—and not just "business income." (*Uniroyal Tire, supra,* 779 So.2d at p. 232.) In other words, "[t]he concluding twenty-six words . . . are added to include transactions involving disposal of fixed assets by taxpayers *who emphasize the trading of assets as an integral part of regular business.*" (*Phillips Petroleum v. Dept. of Revenue* (Iowa 1994) 511 N.W.2d 608, 610 (*Phillips Petroleum*), italics added.)

The language of the second clause provides some support for such an interpretation. The second clause states that the "acquisition, management, *and* disposition" of property must be "integral parts" of the taxpayer's "regular" "business operations." (§ 25120, subd. (a), italics added.) The use of "and" suggests that the second clause merely exemplifies the first because the sale of property " 'that is not regularly disposed of, but rather is held indefinitely,' " arguably cannot be an integral part of the taxpayer's business operations. (*Uniroyal Tire, supra,* 779 So.2d at p. 234, quoting Faber, *When*

*Does the Sale of Corporate Assets Produce Business Income for State Corporate Franchise Tax Purposes?* (May-June 1995) The Tax Executive 179, 187.)

Moreover, the apparent breadth of the second clause equally supports the rejection of the functional test. As the Alabama Supreme Court observed: "If income is business income under the transactional test, then, a fortiori, it is business income under the functional test. In other words, the functional test would include everything that the transactional test includes—and much more." (*Uniroyal Tire, supra,* 779 So.2d at pp. 235-236.) As such, construing section 25120 to create two alternative tests for business income arguably renders the first clause mere surplusage, in violation of the rules of statutory construction. (See *People v. Cruz* (1996) 13 Cal.4th 764, 782 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

In light of these competing arguments, we conclude that the statutory language is ambiguous as to the existence of a separate functional test. At a minimum, we cannot find that either interpretation is unreasonable based solely on the statutory language. Indeed, the conflicting opinions of our sister courts interpreting the very same language demonstrate that reasonable minds may disagree over whether the business income definition creates a functional test.[6] Therefore, we must now turn to extrinsic aids in an effort to ascertain the Legislature's intent. These aids establish that the Legislature intended to create both a transactional and functional test for business income.

As an initial matter, the legislative history behind the UDITPA strongly supports the inclusion of a functional test. Because the Legislature adopted the UDITPA almost verbatim (Keesling & Warren, *supra,* 15 UCLA L.Rev.

[6]Compare *Uniroyal Tire, supra,* 779 So.2d at page 236 (transactional test only); *Phillips Petroleum, supra,* 511 N.W.2d at page 610 (same); *Western Natural Gas Co. v. McDonald* (1968) 202 Kan. 98 [446 P.2d 781, 783] (*Western Natural Gas*) (same); *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue* (1975) 88 N.M. 521 [543 P.2d 489, 492] (*McVean*) (citing the functional test language but applying the principles of the transactional test); *Associated Partnership I, Inc. v. Huddleston* (Tenn. 1994) 889 S.W.2d 190, 195 (*Associated Partnership I*) (transactional test only) with *Pledger v. Getty Oil Exploration Co.* (1992) 309 Ark. 257 [831 S.W.2d 121, 124-125] (*Pledger*) (applying a separate functional test); *Dist. of Columbia v. Pierce Associates, Inc.* (D.C. 1983) 462 A.2d 1129, 1131 (*Pierce Associates*) (same); *Texaco-Cities Service Pipeline Co. v. McGaw* (1998) 182 Ill.2d 262 [230 Ill.Dec. 991, 695 N.E.2d 481, 485] (*Texaco-Cities*) (same); *Montana Dept. of Revenue v. American Smelting and Refining Co.* (1977) 173 Mont. 316 [567 P.2d 901, 907] (*American Smelting*) (same); *Polaroid, supra,* 507 S.E.2d at page 295 (same); *Simpson Timber Co. v. Dept. of Revenue* (1998) 326 Or. 370 [953 P.2d 366, 369] (*Simpson Timber*) (same); *Ross-Araco Corp. v. Commonwealth of Pennsylvania* (1996) 544 Pa. 74 [674 A.2d 691, 696-697] (*Ross-Araco*) (same).

at p. 156), we look to the history behind the UDITPA for guidance (see *Bonds, supra,* 24 Cal.4th at pp. 16-19). This history reveals that the UDITPA definition of "business income" derives from "California decisional law" which employed a separate functional test for business income. (Peters, *supra,* 25 So.Cal. Tax Inst. at p. 278.)

The first draft of the UDITPA did not distinguish between business and nonbusiness income. (Peters, *supra,* 25 So.Cal. Tax Inst. at pp. 272-273.) After concerns about the constitutionality of the first draft arose, John S. Warren, a California tax administrator, suggested that the Commissioners divide all income into apportionable business income and allocable nonbusiness income. As part of his suggestion, Warren proposed a definition of business income based on language used in certain SBE decisions. (*Id.* at pp. 275-276.) The Commissioners liked Warren's proposal, and "[t]he final draft of the [UDITPA] contained the definitions of business income and nonbusiness income proposed by Mr. Warren." (Peters, *supra,* at p. 276.) Thus, the UDITPA's definition of business income was based on pre-UDITPA decisions of the SBE, and the UDITPA's distinction between business and nonbusiness income was "in line with . . . California practice" at the time of its enactment. (Keesling & Warren, *supra,* 15 UCLA L.Rev. at pp. 163-164; see also *Polaroid, supra,* 507 S.E.2d at p. 294 ["the uniform definition of business income, as set forth in UDITPA, finds its origins in early California jurisprudence"].) Accordingly, our interpretation of the business income definition should be guided by the SBE's pre-UDITPA decisions applying language similar to the language of the UDITPA.

These SBE decisions consistently applied an *independent* functional test when determining whether income constituted business income. In doing so, the SBE used language virtually identical to the language in the second clause of the statutory definition. For example, in *Appeal of Marcus-Lesoine, Inc.* (July 7, 1942) 2 SBE 338, 340-341, the SBE held that interest income from conditional sales contracts constituted business income *solely* because "the acquisition, management and liquidation of the intangibles constitute[d] integral parts of the corporation's regular business operations." Similarly, the SBE found that copyright royalties were business income *solely* because the "acquisition, management and disposition of the intangibles constitute[d] integral parts of the corporation's regular business operations." (*Appeal of Houghton Mifflin Co.* (Mar. 28, 1946) 3 SBE 344, 345 (*Houghton Mifflin*).) The SBE also relied *solely* on the functional test when it held that patent royalties constituted business income. (*Appeal of National Cylinder Gas Co.* (Feb. 5, 1957) 6 SBE 153, 154 ["We have consistently held . . . that income from intangibles is includible in unitary income and subject to [apportionment] if the acquisition, management and disposition of the intangibles

constitute integral parts of the unitary business"]; *Appeal of Intern. Business Machines Corp.* (Oct. 7, 1954) 6 SBE 5, 6-7 ["we have previously held that income from such intangibles [patents] is subject to [apportionment] where the acquisition, management and disposition of the intangibles constitute integral parts of the owner's regular business operations"].) Because these SBE decisions construe the language of the second clause as an independent test for business income, we hold that a separate functional test exists.

The comments to section 1, subdivision (a) of the UDITPA prepared by the Commissioners (Commissioners Comments) bolster our holding. The comment states in part that "[i]ncome from the disposition of property used in a trade or business of the taxpayer is includible within the meaning of business income." (Comrs. Coms., UDITPA, com. foll. § 1, subd. (a), p. 2, reprinted at <http://www.law.upenn.edu/bll/ulc/fnact99/1920_69/udiftp57.htm> [as of May 14, 2001].) By focusing on the "property" and its relationship to the "trade or business" and using the "disposition" language of the second clause (*ibid.*), the Commissioners' comment strongly suggests that a separate functional test for business income exists. Indeed, the comment ostensibly makes all income from the disposition of property used in the taxpayer's business apportionable even if the disposition does not occur "in the regular course of the taxpayer's trade or business." (7A pt. 1 West's U. Laws Ann., *supra*, UDITPA, § 1, subd. (a), pp. 361-362.)

Administrative decisions interpreting the statutory definition of "business income" also support the inclusion of a separate functional test. ■ Although we are not bound by administrative decisions construing a controlling statute, we accord " 'great weight and respect to the administrative construction.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*), quoting *International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal.Rptr. 782, 609 P.2d 1].) The amount of deference given to the administrative construction depends " 'upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.*' " (*Yamaha*, at pp. 14-15, italics added by *Yamaha*, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [65 S.Ct. 161, 164, 89 L.Ed. 124].)

■ In light of these considerations, we find the SBE decisions construing the language of the second clause of the statutory business income definition as an independent functional test for business income highly

persuasive. In *Borden, supra*, (1971-1978 Transfer Binder) Cal.Tax Rptr. (CCH), paragraph 205-616, page 14,897-59, the SBE first addressed the validity of the functional test and held that section 25120 authorized a separate "functional test for business income." In a thorough and well-reasoned opinion, the SBE discussed the legislative history behind the UDITPA and relied heavily on those California administrative decisions that formed the basis for the business income definition. (*Borden*, at pp. 14,897-58 to 14,897-59.) The SBE also cited language in regulations proposed by the Multistate Tax Commission and enacted in California that supported the existence of a separate functional test. (*Id.* at p. 14,987-59.) Finally, the SBE rejected the contrary conclusion reached by the Kansas and New Mexico courts in *Western Natural Gas, supra*, 446 P.2d at page 783, and *McVean, supra*, 543 P.2d at page 492, because these courts did not consider the UDIPTA's history or the regulations. (*Borden*, at p. 14,897-59.) During the 24 years since *Borden*, the SBE has consistently applied both a transactional and functional test when determining whether income constitutes business income under subdivision (a) of section 25120.[7] Because the SBE thoroughly considered the issue, reached a reasonable conclusion, and consistently applied this conclusion over the past 24 years, we see no reason to overturn the SBE's long-standing construction. (See *Yamaha, supra*, 19 Cal.4th at pp. 12-15.)

---

[7](See, e.g., *Appeal of CTS Keene, Inc.* (Feb. 10, 1993) [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 402-589, p. 27,569; *Appeal of Dial Finance Co. of Cal.* (Feb. 10, 1993) [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 402-586, p. 27,553; *Appeal of American Biltrite Inc.* (Nov. 19, 1992) [1991-1992 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 402-531, p. 27,407-3; *Appeal of VSI Corp.* (May 2, 1991) [1991-1992 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-937, p. 26,240 (*VSI Corp.*); *Appeal of Masonite Corp.* (Nov. 15, 1988) [1986-1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-677, p. 25,335; *Appeal of R.H. Macy & Co.* (July 26, 1988) [1986-1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-639, p. 25,195; *Appeal of U-Haul Co. of Van Nuys* (Mar. 3, 1987) [1986-1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-489, p. 24,667; *Appeal of Mark Controls Corp.* (Dec. 3, 1986) [1986-1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-451, p. 24,566 (*Mark Controls*); *Appeal of National Dollar Stores, Inc.* (Sept. 10, 1986) [1984-1986 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-403, p. 24,429 (*National Dollar Stores*); *Appeal of Armour Oil Co.* (June 10, 1986) [1984-1986 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-355, p. 24,325; *Appeal of Southwestern Development Co.* (Sept. 10, 1985) [1984-1986 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-157, p. 23,898; *Appeal of Calvo Growers of Cal.* (Feb. 28, 1984) [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-673, p. 23,035; *Appeal of Johns-Manville Sales Corp.* (Aug. 17, 1983) [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-476, p. 22,741; *Appeal of Amwalt Group, Inc.* (July 28, 1983) [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-433, p. 22,693 (*Amwalt Group*); *Appeal of Occidental Petroleum Corp.* (June 21, 1983) [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-394, p. 22,609 (*Occidental Petroleum*); *Appeal of Standard Oil Co. of Cal.* (Mar. 2, 1983) [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-383, p. 22,561 (*Standard Oil*); *Appeal of DPF, Inc.* (Oct. 28, 1980) [1978-1981 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 206-429, p. 14,965-36; *Kroehler, supra*, [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-646, p. 14,897-122; *Appeal of New York Football Giants, Inc.* (Feb. 3, 1977) [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-600, p. 14,897-31 (*New York Football Giants*).)

Finally, construing the second clause of the definition as a separate functional test fulfills one of the primary objectives behind the UDITPA—to promote uniformity among the states. (Keesling & Warren, *supra*, 15 UCLA L.Rev. at p. 156.) Although courts in other jurisdictions that have adopted the UDITPA have disagreed over the existence of a separate functional test, the state legislatures in these jurisdictions have not. In four of the five states where the state court rejected the functional test, the state legislature amended the definition of business income to include such a test.[8] (See Iowa Code § 422.32; Kan. Stat. Ann. § 79-3271, subd. (a) [taxpayer may elect to apply the functional test]; N.M. Stat. Ann. § 7-4-2, subd. A; Tenn. Code Ann. § 67-4-2004.) Thus, virtually all states adopting the UDITPA now construe the second clause of the business income definition as a separate functional test. In the interests of promoting uniformity, we do the same. Accordingly, Hoechst's income from the reversion of surplus pension plan assets is apportionable as business income if it satisfies *either* the transactional test or the functional test.

B. *The Transactional Test*

■ Under the transactional test, corporate income is business income if it arises "from transactions and activity in the regular course of the taxpayer's trade or business." (§ 25120, subd. (a).) Upon construing and applying this statutory language, we conclude that Hoechst's reversion of surplus pension plan assets fails to meet the transactional test.

The language of the transactional test is unambiguous, and courts have construed this language in a consistent manner. "The controlling factor by which" the transactional test "identifies business income is the nature of the particular transaction" that generates the income. (*Western Natural Gas*, *supra*, 446 P.2d at p. 783.) To create business income, these "transactions and activity" must occur "in the *regular* course of the taxpayer's trade or business." (§ 25120, subd. (a), italics added.) "[R]elevant considerations include the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income." (*Associated Partnership I, supra*, 889 S.W.2d at p. 195.) "[U]nprecedented, . . . once-in-a-corporate-lifetime occurrence[s]" do not meet the transactional test because they do not occur in the regular course of any business. (*Phillips Petroleum, supra*, 511 N.W.2d at pp. 610-611.) Thus, income arising from "extraordinary" events such as a "complete liquidation

[8]Only Alabama has not amended its definition of business income to include a functional test. Of course, the Alabama Supreme Court only issued its decision rejecting the functional test in August 2000.

and cessation of business" cannot satisfy the transactional test. (*Uniroyal Tire, supra*, 779 So.2d at p. 236.)

Here, the reversion and the activities necessary to execute the reversion were extraordinary occurrences. They were not normal trade or business activities of Hoechst, which manufactured and sold a diversified line of chemicals, fibers and specialty products. Indeed, the 1985 reversion of surplus pension plan assets was the first and only such transaction in Hoechst's corporate history. Because the reversion was a "once-in-a-lifetime corporate occurrence," it cannot meet the transactional test. (*Phillips Petroleum, supra*, 511 N.W.2d at pp. 610-611.)

In reaching this conclusion, we reject the Board's attempt to define the relevant "transactions and activity" as the purchase and sale of securities by the fund managers appointed by Hoechst. (§ 25120, subd. (a).) These investments did not result in *any taxable income* to Hoechst *until and unless*: (1) the investments generated more assets than necessary to fund the defined benefits owed to plan members; and (2) Hoechst acted to recapture these surplus assets. Thus, the only transaction or activity that generated any taxable income for Hoechst was the reversion itself. Accordingly, the income from the reversion does not satisfy the transactional test and is apportionable to California only if it meets the functional test.

## C. *The Functional Test*

██ Under the functional test, corporate income is business income "if the acquisition, management, and disposition of the [income-producing] property constitute integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a).) ██ After reviewing the statutory language and the applicable extrinsic aids, we hold that the reversion satisfies the functional test. Therefore, the income from the reversion is business income apportionable to California.

██ We begin our analysis by examining the statutory language. In contrast to the transactional test, which focuses on the income-producing "transactions and activity," the functional test focuses on the income-producing "property." (§ 25120, subd. (a).) This property may be "tangible" or "intangible" (*ibid.*), and the nature of the relationship between this property and the taxpayer's "business operations" is the critical inquiry (*Texaco-Cities, supra*, 695 N.E.2d at p. 486 [the functional test "focuses upon the role or function of the property as being integral to regular business operations"]).

Before defining the relationship necessary to meet the functional test, we reject at the outset Hoechst's contention that the statutory term "property" implies that the taxpayer must own or hold legal title to the property. Such an interpretation only considers the term "property" in isolation and ignores the conditional clause that places this term in context: "if the acquisition, management, and disposition of the *property* constitute integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a), italics added.) This conditional clause—and not the vague implications of the term "property"—defines the relationship between the property and the taxpayer required by the functional test.

The conditional clause contains two key phrases: "acquisition, management, and disposition of the property" and "integral parts of the taxpayer's regular trade or business operations." (§ 25120, subd. (a).) The first phrase— "acquisition, management, and disposition of the property"—appears to refer to the taxpayer's interest in and power over the income-producing property. (*Ibid.*) In construing this phrase, the parties focus on the meaning of the word "and." (*Ibid.*) Hoechst contends "and" has a conjunctive meaning, while the Board contends "and" has a disjunctive meaning in the statute. (*Ibid.*) Because "and" is ordinarily conjunctive and because nothing suggests a legislative intent to give "and" a different meaning, we agree with Hoechst. (See *Wilcox*, *supra*, 21 Cal.4th at p. 977.) We do not, however, end our inquiry there. Rather, we find it both instructive and necessary to consider the meaning of the terms "acquisition," "management," and "disposition" in the context of the business income definition. (§ 25120, subd. (a).)

Upon doing so, we conclude that the phrase "acquisition, management, and disposition" "refers to the conditions of ownership of property by the taxpayer." (*Kroger*, *supra*, 673 N.E.2d at p. 714.) Such a conclusion follows logically from the ordinary meanings of these words. At the time of the enactment of the California UDITPA, "acquisition" signified the "act of acquiring" (Webster's 3d New Internat. Dict. (1961) p. 19), and "acquire" meant "to come into possession, control, or power of disposal of" (*id.* at p. 18). "[M]anagement" referred to the "act . . . of managing," and "manage" meant "to control and direct: handle either well or ill: cope with: CONDUCT, ADMINISTER" and "to direct or carry on business or affairs: SUPERVISE, ADMINISTER." (*Id.* at p. 1372.) Finally, "disposition" denoted "*the act or the power* of disposing or disposing of" and, as relevant here, "dispose of" meant "to transfer into new hands or to the control of someone else . . . RELINQUISH, BESTOW." (*Id.* at p. 654, italics added.) In light of these definitions, the phrase "acquisition, management, and disposition of the property" establishes that the taxpayer must: (1) obtain some interest in and

control over the property; (2) control or direct the use of the property; and (3) transfer, or have the power to transfer, control of that property in some manner.

Under this construction, legal ownership or title to the property is not necessary. Such a limitation is too restrictive because property ownership "finds expression through multiple methods." (*Union Oil Co. v. State Bd. of Equal.* (1963) 60 Cal.2d 441, 447 [34 Cal.Rptr. 872, 386 P.2d 496].) "Ownership is not a single concrete entity but a bundle of rights and privileges as well as of obligations." (*Ibid.*, fn. omitted.) Indeed, corporations often control and use property to generate business income without owning or holding legal title to that property. Consequently, we believe the phrase "acquisition, management, and disposition" encompasses the myriad of ways that corporations may control and use the rights and privileges commonly associated with property ownership.

The Commissioners Comments to the UDITPA confirm our belief. In the comment to section 1 of the UDITPA, the Commissioners state that "[i]ncome from the disposition of property" is business income if the property is "*used* in a trade or business of the taxpayer." (Comrs. Coms., UDITPA, com. foll. § 1, subd. (a), p. 2, reprinted at <http://www.law.upenn.edu/bll/ulc/fnact99/1920_69/udiftp57.htm> [as of May 14, 2001], italics added.) In making this statement, the Commissioners clearly contemplated that the functional test would focus on the taxpayer's control and use of the property and not on legalistic formulations of property ownership.

Of course, mere control and use of the income-producing property is not enough to satisfy the functional test. Rather, the taxpayer's control and use of the property must still be an "integral part[] of the taxpayer's regular trade or business operations." (§ 25120, subd. (a).) The critical terms in this second key phrase of the functional test are "integral," "regular," and "operations." (*Ibid.*) As explained below, these terms establish that the taxpayer's control and use of the property must contribute materially to the taxpayer's production of business income so that the property becomes interwoven into and inseparable from the taxpayer's business.

We begin our interpretation of this phrase by defining the terms "regular" and "operations." "[R]egular" means "NORMAL" or "TYPICAL." (Webster's 3d New Internat. Dict., *supra*, at p. 1913.) In the business context, "operations" mean "the whole process of planning for and operating a business" or "a phase of a business or of business activity." (*Id.* at p. 1581.) As such, the

phrase "regular trade or business operations" is unambiguous and refers to the normal or typical business activities of the taxpayer. (§ 25120, subd. (a).)

To reach this conclusion, we reject Hoechst's contention that the word "regular" limits the functional test to normal or customary corporate events. Although "regular" has the same meaning in the transactional and functional tests, it is not used in the same way in these tests. In the transactional test—which focuses on the income-producing transaction—"regular" modifies "course of the taxpayer's trade or business" and makes the nature of the transaction relevant. (*Associated Partnership I, supra,* 889 S.W.2d at p. 195.) In the functional test—which focuses on the income-producing property— "regular" modifies "trade or business operations" and follows the phrase "an integral part of." (§ 25120, subd. (a).) Consequently, "regular," as used in the functional test, does not refer to the nature of the transaction, and the extraordinary nature or infrequency of the income-producing transaction is irrelevant. (See *Citicorp of North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1430 [100 Cal.Rptr.2d 509] (*Citicorp*); see also *Pierce Associates, supra,* 462 A.2d at p. 1131; *Texaco-Cities, supra,* 695 N.E.2d at p. 484; *Polaroid, supra,* 507 S.E.2d at p. 289; *Ross-Araco, supra,* 674 A.2d at p. 693.)

Thus, the phrase "regular trade or business operations" (§ 25120, subd. (a)) establishes that the taxpayer's control and use of the income-producing property must be part of the taxpayer's normal or typical business activities. The statutory term "integral" then provides the touchstone for determining whether the property has a close enough relationship to the taxpayer to satisfy the functional test. (*Ibid.*) Not surprisingly, the parties disagree over the meaning of "integral." (*Ibid.*) Hoechst contends "integral" means "necessary or essential to." The Board counters that "integral" only means "contributing to." We, however, find neither interpretation to be accurate. Instead, we hold that "integral" requires an organic unity between the taxpayer's property and business activities whereby the property contributes materially to the taxpayer's production of business income.[9]

As an initial matter, we note that the dictionary definition of "integral" arguably supports both parties' positions. As defined by Webster's Third International Dictionary, *supra,* at page 1173, "integral" means "of, *relating to,* or serving to form a whole: *essential to* completeness: organically joined

---

[9] In describing the functional test in terms of the production of *business income,* we mean the production of income that unquestionably fits within the statutory definition of business income.

or linked: CONSTITUENT, INHERENT." (Italics added.) The relevant case law also lends support to both interpretations. On the one hand, we have suggested that "integral" means " 'dependent upon or contributes to' " in the multistate taxation context. (*Superior Oil Co. v. Franchise Tax Bd.* (1963) 60 Cal.2d 406, 413-414 [34 Cal.Rptr. 545, 386 P.2d 33], quoting *Edison California Stores, Inc. v. McColgan* (1947) 30 Cal.2d 472, 481 [183 P.2d 16].) On the other hand, other jurisdictions have used the "essential to" language when construing the functional test. (See, e.g., *Texaco-Cities, supra*, 695 N.E.2d at p. 485; *Union Carbide Corp. v. Offerman* (2000) 351 N.C. 310 [526 S.E.2d 167, 171] (*Union Carbide*).)

Nonetheless, we believe that both interpretations are problematic and do not capture the true meaning of "integral." (§ 25120, subd. (a).) Construing "integral" as "contributing to" makes the test too expansive and creates constitutional problems. Although property that is integral to a taxpayer's business undoubtedly contributes to that business, "integral" must imply something more than a mere contribution. Otherwise, the functional test would encompass all corporate transactions and run afoul of the constitutional limits on state taxation. (See *ASARCO, Inc. v. Idaho State Tax Comm'n* (1982) 458 U.S. 307, 326 [102 S.Ct. 3103, 3114, 73 L.Ed.2d 787] (*ASARCO*) [property must do more than contribute to the taxpayer's business in order to be taxed by a state].) Construing "integral" as "necessary or essential to," however, is too restrictive. Under this interpretation, many sales of corporate property could not satisfy the functional test because a corporate taxpayer presumably will not sell property unless the property is no longer necessary or essential to its business. Such an outcome conflicts with the explanatory comments to the UDITPA which contemplate the apportionment of gains realized from any sale of property used in the taxpayer's trade or business. (Comrs. Coms., UDITPA, com. foll. § 1, subd. (a), p. 2, reprinted at <http://www.law.upenn.edu/bll/ulc/fnact99/1920_69/udiftp57.htm> [as of May 14, 2001].)

Thus, the meaning of "integral" must fall somewhere in between these two interpretations. In forging this middle ground, we once again look to the SBE decisions underlying the functional test for guidance. (See *ante*, at pp. 524-525; see also Keesling & Warren, *supra*, 15 UCLA L.Rev. at pp. 163-164; *Polaroid, supra*, 508 S.E.2d at p. 294.) These decisions reveal that the meaning of "integral" comes from our decision in *Holly Sugar Corp. v. Johnson* (1941) 18 Cal.2d 218 [115 P.2d 8] (*Holly Sugar*). (See *Houghton Mifflin, supra*, 3 SBE at p. 346 [relying on *Holly Sugar*].) In *Holly Sugar*, we held that losses suffered by a taxpayer from the forced liquidation of stock were apportionable because "the stockholding in question was an integral

part of [the taxpayer's] unitary sugar business." (*Holly Sugar*, at p. 225.) The stockholding was "integral" because it could not "reasonably be characterized as an extraneous investment separate and apart from the California business" of the taxpayer. (*Id.* at p. 224.) Rather, "the activities of the two companies" constituted "one indivisible, composite whole, each portion giving value to every other portion." (*Ibid.*) Because of "this organic unity of operation," we regarded the liquidation of the stockholding as an "integral" part of the unitary business of the taxpayer. (*Id.* at pp. 224-225.)

In the context of the business income definition, the word "integral" therefore refers to an "organic unity" between the income-producing property and the taxpayer's business activities. (*Holly Sugar, supra*, 18 Cal.2d at p. 224.) The property must be so interwoven into the fabric of the taxpayer's business operations that it becomes "indivisible" or inseparable from the taxpayer's business activities with both "giving value" to each other. (*Ibid.*) Such a relationship exists when the taxpayer controls and uses the property to contribute materially to the taxpayer's production of business income. (See *Borden, supra*, [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-616, p. 14,897-59; *New York Football Giants, supra*, [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-600, p. 14,897-33.) In this way, we capture the true meaning of "integral." (See Webster's 3d Internat. Dict., *supra*, at p. 1173 ["integral" means "serving to *form a whole*: essential to *completeness*: *organically joined or linked*" (italics added)].)

Forming these interpretations of the statutory language into a cohesive whole, we conclude that income is business income under the functional test if the taxpayer's acquisition, control and use of the property contribute materially to the taxpayer's production of business income. In making this contribution, the income-producing property becomes interwoven into and inseparable from the taxpayer's business operations. Such an interpretation of the functional test flows from the ordinary meaning of the statutory language and the California decisions that formed the basis for the UDITPA definition of "business income."

We further note that our interpretation is consistent with Court of Appeal decisions applying the functional test. For example, the Court of Appeal has found business income where the income-producing property contributed materially to the taxpayer's production of business income. In *Citicorp*, the court held that income from a taxpayer's sale of buildings constituted business income under the functional test because "the buildings were constructed or acquired to serve as important locations for [the taxpayer's

business] operations." (*Citicorp, supra*, 83 Cal.App.4th at pp. 1429-1430.) Thus, the court premised its finding of business income on the buildings' material contribution to the taxpayer's production of business income and concluded that the buildings were an indivisible part of the taxpayer's business operations. (See *ibid.*; see also *Times Mirror Co. v. Franchise Tax Bd.* (1980) 102 Cal.App.3d 872, 877-878 [162 Cal.Rptr. 630] [income from the taxpayer's sale of a subsidiary's stock was business income because the subsidiary generated business income].)

In contrast, the Court of Appeal has found nonbusiness income where the taxpayer's control and use of the property did not contribute materially to the generation of business income. In *Robert Half*, the court found that losses incurred from the repurchase of a stock warrant constituted nonbusiness income. (*Robert Half, supra*, 66 Cal.App.4th at p. 1028.) Although the court mistakenly focused on the extraordinary nature of the transaction (see *id.* at p. 1025), it reached the correct result. The taxpayer's control and use of the warrants did not contribute materially to the production of any business income and were separate and distinct from the taxpayer's business operations. Therefore, losses from the repurchase of the warrants did not satisfy the functional test.

Our interpretation of the functional test also accords with the SBE's interpretation over the past two decades. On the one hand, the SBE has consistently found business income under the functional test where the taxpayer's control and use of the property contributed materially to the production of business income and became an indivisible part of the taxpayer's business. For example, the SBE found that losses from the sale of goodwill constituted business income because the taxpayer's acquisition and maintenance of this goodwill "contributed materially to the production of business income." (*Borden, supra*, [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-616, p. 14,897-59.) The SBE also held that compensation received for the loss of exclusive territorial rights constituted business income because these rights were "an important aspect of the business" and "contributed materially to the production of business income." (*New York Football Giants, supra*, [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-600, p. 14,897-33.) Similarly, the SBE found that dividends from a joint venture were business income because these ventures "contributed materially to the production of operating income . . . and clearly served to further the operation of" the taxpayer's business. (*Standard Oil, supra*, [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-383, at p. 22,571.) Finally, the SBE held that income from stock sales constituted business income because "the assets and activities represented by the stock were fully integrated and

functioning parts of [the taxpayer's] existing unitary business." (*Occidental Petroleum, supra,* [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-394, p. 22,616.)

On the other hand, the SBE has consistently refused to find business income under the functional test where the taxpayer's control and use of the property did. not contribute materially to the production of business income and were separate from the taxpayer's business. For example, the SBE found that rental income from a condominium constituted nonbusiness income because the rental business had no connection to the taxpayer's architectural business. (*Amwalt Group, supra,* [1981-1984 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 400-433, p. 22,696.) Similarly, the SBE held that income from the sale of stock in a company constituted nonbusiness income where the taxpayer exercised no control over and received no special benefits from that company. (*Mark Controls, supra,* [1986-1990 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-452, p. 24,569.) Finally, the SBE held that property used to obtain tax benefits did not give rise to business income because the property did not contribute to the production of business income and was not connected to any business activity of the taxpayer. (*VSI Corp., supra,* [1991-1992 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-937, pp. 26,241 to 26,242; *National Dollar Stores, supra,* [1984-1986 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 401-403, p. 24,432.)

Finally, our interpretation is largely consonant with the decisions of other jurisdictions that have adopted the functional test. These jurisdictions have focused on the taxpayer's use of the property and typically find business income where the taxpayer uses that property to produce business income. (See, e.g., *Pierce Associates, supra,* 462 A.2d at p. 1132 [insurance proceeds for flood damage to manufacturing facility used by the taxpayer to generate business income]; *Texaco-Cities, supra,* 695 N.E.2d at pp. 486-487 [income from sale of pipeline and related assets used by the taxpayer to produce business income]; *American Smelting, supra,* 567 P.2d at pp. 907-909 [royalties from patents developed and used by the taxpayer, income from leases of mines and rental of homesites to workers, interest income from short-term investments, income from sale of stock in companies used by the taxpayer for access to raw materials or as customers]; *Simpson Timber, supra,* 953 P.2d at pp. 369-370 [proceeds from condemnation of timbered property used by the taxpayer as a source of raw materials].) These jurisdictions, however, refuse to find business income where the taxpayer has no control over the property or does not use the property in the production of business income. (See, e.g., *Pledger, supra,* 831 S.W.2d at p. 125 [interest income from intercorporate note passively held and not controlled by the taxpayer];

*Ross-Araco, supra,* 674 A.2d at p. 697 [income from sale of land never improved or used by the taxpayer]; *Laurel Pipe Line Co. v. Commonwealth of Pennsylvania* (1994) 537 Pa. 205 [642 A.2d 472, 475] [income from sale of pipeline not used by the taxpayer for over three years].)

 Having established the contours of the functional test, we now apply it to Hoechst's reversion of surplus pension plan assets and conclude that the reversion meets this test. In reaching this conclusion, we find two SBE decisions instructive. In *Appeal of American Snuff Co.* (Apr. 20, 1960) [1959-1962 Transfer Binder] Cal.Tax Rptr. (CCH) paragraph 201-538, page 12,053 (*American Snuff*), the SBE held that interest income from loans made to the taxpayer's employees constituted business income under the functional test. Because the taxpayer made these loans "for the purpose of increasing the efficiency of the employees and they, accordingly, contributed to the operations of the unitary business," the SBE concluded that "the acquisition, management and disposition of" the loans "constitute[d] integral parts of the" taxpayer's "regular business operations." (*Ibid.*) Seventeen years later, the SBE applied the same reasoning and found that a rebate of surplus funds in a retirement plan constituted business income. (*Kroehler, supra,* [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-647, p. 14,897-123.) Because the plan served "[a]s an inducement to retain the current employees of the Furniture Division and to attract other qualified employees," and because employees were necessary to conduct the taxpayer's business operations, the SBE held that the "acquisition, management, and disposition of" the plan "constitute[d] integral parts of [the taxpayer's] manufacturing and sales business." (*Ibid.*)

Taken together, these decisions establish that property maintained and used by a taxpayer to retain and attract employees is integral to the taxpayer's business operations. Although these decisions are not binding, we find them especially persuasive because of their longevity, consistency and reasoning. (See *Yamaha, supra,* 19 Cal.4th at pp. 12-14.) Indeed, *American Snuff*—which predates the California UDITPA—is arguably controlling because the Legislature presumably enacted the UDITPA with the understanding that it did not alter existing California law. (See Keesling & Warren, *supra,* 15 UCLA L.Rev. at pp. 163-164 [the UDITPA's distinction between business and nonbusiness income "is in line with . . . existing California practice"].) Moreover, at least one other state court applying the functional test has applied similar reasoning to reach a similar conclusion. (See *American Smelting, supra,* 567 P.2d at p. 907 [holding that rental income from homesites rented to employees constituted business income because the homesites were an integral part of the taxpayer's business operations].)

In light of the reasoning of these decisions, the income from Hoechst's reversion of surplus pension plan assets constitutes business income under the functional test. Hoechst created the income-producing property—the pension plan and trust—in order to retain its current employees and to attract new employees. Hoechst had "broad authority to amend [the] plan" (*Hughes Aircraft, supra,* 525 U.S. at p. 442 [119 S.Ct. at p. 762]), and retained an interest in any surplus pension plan assets. It funded the plan with its business income and used these contributions to reduce its tax liability. Hoechst exercised control over the plan and its assets through various committees composed of its officers and employees. For example, Hoechst controlled: (1) the appointment of trustees over the pension plan assets; (2) the appointment of investment fund managers; and (3) the administration of the plan and its assets. In doing so, Hoechst directed the plan's overall investment strategy. Indeed, Hoechst regularly changed trustees and fund managers for various reasons, including inadequate performance, and even "drastically altered" the plan's investment strategy in 1978. The surplus pension plan assets generated from this new investment strategy then allowed Hoechst to reduce or suspend its contributions to the plan otherwise required under ERISA. (See *Hughes Aircraft, supra,* 525 U.S. at p. 441 [119 S.Ct. at p. 762].) Finally, Hoechst disposed of the pension plan assets by transferring these assets to two new plans and trusts, terminating one of these plans and trusts, and reverting the surplus assets of the terminated plan and trust to itself. Because the pension plan assets contributed materially to Hoechst's production of business income via their effect on Hoechst's labor force, the "acquisition, management and disposition of" these assets "constitute integral parts of" Hoechst's "business operations." (*American Snuff, supra,* [1959-1962 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 201-538, p. 12,053; *Kroehler, supra,* [1971-1978 Transfer Binder] Cal.Tax Rptr. (CCH) ¶ 205-647, p. 14,897-123.)

In reaching this conclusion, we recognize that Hoechst did not own or hold legal title to the pension plan assets, and that ERISA imposed many restrictions on Hoechst's control and use of these assets. (See *Shaw v. Delta Air Lines, Inc.* (1983) 463 U.S. 85, 91 [103 S.Ct. 2890, 2896-2897, 77 L.Ed.2d 490].) Nonetheless, Hoechst's control and use of the pension plan assets still contributed materially to its production of business income by improving the efficiency and quality of its workforce which, in turn, generated Hoechst's business income. Thus, the pension plan assets were integral to Hoechst's business operations, because these assets were interwoven into and inseparable from Hoechst's employee retention and recruitment efforts—an essential part of any business operation.

We further note that apportioning income from the reversion to California is equitable in light of the tax benefits received by Hoechst in connection

with its control and use of the pension plan assets. Not only did Hoechst receive an operational benefit from its pension plan contributions, it also received a tax deduction for these contributions throughout the lifetime of the plans. Absent their use in the pension plans, these contributions would have been taxable as business income by California. Thus, Hoechst essentially received the pension plans' contribution to its California business operations *tax free* prior to its reversion of surplus pension plan assets. In fact, absent apportionment of the income from the reversion, Hoechst would receive a windfall because New York—Hoechst's commercial domicile—taxed only a small percentage of the reverted income. Under these circumstances, subjecting income from the reversion to taxation in California is both fair and reasonable.

Finally, the absence of any reference to these pension plan assets in Hoechst's financial statements is irrelevant. These omissions are the product of accounting standards in effect prior to 1985 and do not necessarily reflect the actual relationship between the assets and Hoechst's business operations. In any event, national accounting standards adopted in 1985 now require "expanded disclosures intended to provide more complete and more current information" about pension plan assets in financial statements. (Fin. Acctg. Stds. Bd., Summary of Statement No. 87, Employers' Accounting for Pensions (Dec. 1985) p. 3, at <http://www.rutgers.edu/Accounting/raw/fasb/st/summary/stsum87.htm> [as of May 14, 2001].) The Financial Accounting Standards Board created these standards in an effort to make clearer the link between "pension plan finances" and "the corporations' operations." (*Improving FAS 87* (Oct. 18, 1999) Pensions & Investments, p. 12.) Thus, the failure of Hoechst to report the earnings of its pension plan on its books of account has no bearing here.

We are mindful that the North Carolina Supreme Court reached a contrary conclusion in *Union Carbide, supra,* 526 S.E.2d at page 171. We, however, find the reasoning of the North Carolina Supreme Court questionable in several respects. First, *Union Carbide* seemed to define "integral" as "essential to." (*Ibid.*) As a result, the court applied an overly restrictive interpretation of the functional test. Second, *Union Carbide* appeared to focus on the surplus rather than the income-producing property—the pension plan assets. (*Ibid.*) Thus, the court mistakenly concluded that the pension plan assets did not contribute to the taxpayer's production of business income. Finally, the North Carolina Supreme Court did not consider the California decisions that gave rise to the UDITPA definition of business income even though the court recognized the California roots of the UDITPA. (*Polaroid, supra,* 508 S.E.2d at p. 294.) Because of these deficiencies, we decline to follow *Union*

*Carbide* despite the UDITPA's interest in promoting uniformity. In any event, our reasoning is consistent with the reasoning used by most other jurisdictions that apply the functional test (see *ante,* at p. 534), and conforms to the reasoning used by the Montana Supreme Court in an analogous situation (see *American Smelting, supra,* 567 P.2d at p. 907). Accordingly, we conclude that the reversion created business income under the functional test.

## II

Even though Hoechst's reversion of surplus pension plan assets falls within the statutory definition of business income, subjecting the income from the reversion to taxation in California must still pass constitutional muster. ■ Under the federal due process and commerce clauses, "a State may not tax value earned outside its borders." (*ASARCO, supra,* 458 U.S. at p. 315 [102 S.Ct. at p. 3108].) The taxpayer bears the " 'burden of showing by "clear and cogent evidence" that [the state tax] results in extraterritorial values being taxed.' " (*Exxon Corp. v. Wisconsin Dept. of Revenue* (1980) 447 U.S. 207, 221 [100 S.Ct. 2109, 2119, 65 L.Ed.2d 66], quoting *Butler Bros. v. McColgan* (1942) 315 U.S. 501, 507 [62 S.Ct. 701, 704, 86 L.Ed. 991], in turn quoting *N. & W. Ry. Co. v. No. Carolina* (1936) 297 U.S. 682, 688 [56 S.Ct. 625, 628, 80 L.Ed. 977].) As explained below, Hoechst does not meet this burden. Therefore, apportionment of the income from the reversion to California is constitutional.

In limiting a state's taxing power, courts "are guided by the basic principle that the State's power to tax an individual's or corporation's activities is justified by the 'protection, opportunities and benefits' the State confers on those activities." (*Allied-Signal, supra,* 504 U.S. at p. 778 [112 S.Ct. at p. 2258], quoting *Wisconsin v. J. C. Penney Co.* (1940) 311 U.S. 435, 444 [61 S.Ct. 246, 249-250, 85 L.Ed. 267, 130 A.L.R. 1229].) Thus, there must be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." (*Miller Bros. Co. v. Maryland* (1954) 347 U.S. 340, 344-345 [74 S.Ct. 535, 539, 98 L.Ed. 744].) Corporate income "earned in the course of activities unrelated to [corporate activities in the taxing] State" is not includible in any apportionment formula. (*Mobil Oil Corp. v. Commissioner of Taxes* (1980) 445 U.S. 425, 439 [100 S.Ct. 1223, 1232, 63 L.Ed.2d 510].) The rationale behind this limitation is self-evident: "In a Union of 50 States, to permit each State to tax activities outside its borders would have drastic consequences for the national economy, as businesses could be subjected to severe multiple taxation." (*Allied-Signal, supra,* 504 U.S. at pp. 777-778 [112 S.Ct. at p. 2258].)

In construing these constitutional limitations on a state's taxing power, the United States Supreme Court has focused "on the objective characteristics of the [income-producing] asset's use and its relation to the taxpayer and its activities within the taxing State." (*Allied-Signal, supra,* 504 U.S. at p. 785 [112 S.Ct. at p. 2262].) This relationship must involve a "flow of value . . . ." (*Container Corp., supra,* 463 U.S. at p. 178 [103 S.Ct. at p. 2947], italics omitted.) As such, only income from assets that "serve an operational rather than an investment function" are apportionable to a state for tax purposes. (*Allied-Signal, supra,* 504 U.S. at p. 787 [112 S.Ct. at p. 2263].) The mere fact that a transaction has a "business purpose" is not enough. (See *id.* at p. 788 [112 S.Ct. at pp. 2263-2264].) Although the United States Supreme Court has not clearly differentiated operational and investment functions, it has stated that an asset serves an operational function if it helps the taxpayer "make better use . . . of [its] existing business-related resources." (*Container Corp., supra,* 463 U.S. at p. 178 [103 S.Ct. at p. 2947].)

■ Here, the income-producing asset—the pension plan and trust—undoubtedly served an operational function for Hoechst. Hoechst funded the plan and trust with its apportionable business income. It managed the plan and trust by choosing the trustee and appointing a committee of its officers and employees to oversee the trust's administration, to choose its investment managers, and to guide its overall investment strategy. More importantly, Hoechst created and maintained the plan and trust in order to induce its current employees to stay and to attract new employees. As such, the pension plan and trust undoubtedly helped Hoechst "make better use" of an important and existing business-related resource—its employees. (*Container Corp., supra,* 463 U.S. at p. 178 [103 S.Ct. at p. 2947].) Indeed, Hoechst can hardly claim that the pension plan and trust were separable from its employee recruitment and retention efforts—a crucial part of its business operations in California. Accordingly, subjecting an apportionable share of the reverted pension plan assets to taxation in California does not violate the federal due process or commerce clause.

### DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Mosk, J., Kennard, J., Baxter, J., and Chin, J., concurred.

**WERDEGAR, J.**—I respectfully dissent.

The Uniform Division of Income for Tax Purposes Act (Rev. & Tax. Code, § 25120 et seq.) (UDITPA) was intended to help the several states avoid laying conflicting claims on the income of multistate businesses, thereby facilitating compliance with the due process and commerce clauses of the United States Constitution. In today's decision, the court encourages conflicting claims by defining as allocable "business income" (Rev. & Tax. Code, § 25120, subd. (a)) precisely the same type of income that the highest court of a sister state in the only other decision directly on point has defined as nonallocable "nonbusiness income" (*id.*, subd. (d); *Union Carbide Corp. v. Offerman* (2000) 351 N.C. 310 [526 S.E.2d 167]). The court today, in other words, has ensured the UDITPA will not achieve its intended purpose. To what degree the act will fail, only time will tell.

I suspect the act will fail to a large degree, because the majority's definition of business income is potentially all-encompassing. What the majority calls the transactional test captures income from transactions and activity in the regular course of the taxpayer's business. The so-called functional test addresses income from property. "[I]ncome is business income under the functional test," the majority declares, "if the taxpayer's acquisition, control and use of the property contribute materially to the taxpayer's production of business income." (Maj. opn*., ante,* at p. 532.) The taxpayer's creation and indirect management of the ERISA (Employee Retirement Income Security Act of 1974; 29 U.S.C. § 1001 et seq.) trust, the majority reasons, "contributed materially to its production of business income by improving the efficiency and quality of its workforce which, in turn, generated Hoechst's business income." (Maj. opn., *ante,* at p. 536.)

The majority's broad definition of business income under the functional test has two problems, both of which strike at the heart of the UDITPA's purpose of fostering the uniform, constitutional allocation of a single taxpayer's income among the various states entitled to claim a portion thereof.

The first problem is that the majority's definition of business income under the functional test potentially reaches *all* income from business-owned property, thereby rendering illusory, or nearly illusory, the category of nonallocable "nonbusiness" income recognized in the UDITPA. (Rev. & Tax. Code, § 25120, subd. (d).) The majority permits the casual reader to assume *that* some corporate investments, even after today's far-reaching decision, may not be sufficiently integral to the corporation's business

operations for their sale to generate allocable business income. (See maj. opn., *ante*, at pp. 534-535.) The assumption seems to make the decision less far-reaching and therefore more palatable. But the courts and administrative agencies that wrote the opinions the majority cites for reassurance on this point did not have the benefit of today's decision. After today's decision, income from property is allocable business income if there is "an organic unity between the taxpayer's property and business activities whereby the property contributes materially to the taxpayer's production of business income." (Maj. opn., *ante*, at p. 530.) If this test captures income from an ERISA trust, which a corporation does not own and in which the corporation has only a contingent, reversionary interest, then the test must also capture income from other investments in property owned by the corporation and expected at some point to produce income available for business activities. Because a corporation must be able to draw upon its assets for business purposes as and when necessary, the wise management of cash and surplus assets to achieve an appropriate balance of liquidity, risk and return is just as essential to the production of business income as the wise management of human resources. We can, therefore, be sure the State Board of Equalization will soon ask itself whether income from the cash management accounts and other investments, wherever located, of corporations doing some business in California is not subject to taxation in California on the same basis as reversionary income from an ERISA trust. While the majority correctly observes that the former type of income has not been taxed by nondomiciliary states as allocable business income in the past (see maj. opn., *ante*, at pp. 534-535), the majority's decision offers no principled basis for predicting that such income will not be taxed as business income in the future.

The second problem is that the majority's definition betrays a narrow, parochial focus on the decisions of our own State Board of Equalization. We cannot safely assume our sister states will share the majority's firm conviction that California law is best. While Californians who participated in drafting the UDITPA may well have been influenced in that exercise by their knowledge of California law (see maj. opn., *ante*, at p. 522-523), it does not follow that we may properly assume the UDITPA adopted prior California law wholesale, or that we may treat the pre-UDITPA decisions of a single state's administrative agency as equivalent to authoritative interpretations of a uniform, multistate law. The official comments to the UDITPA do not even mention California law.

That said, I nevertheless agree with the majority that it may be "equitable" (maj. opn., *ante*, at p. 536) for California to tax the reversion to the extent Hoechst Celanese Corporation has deducted its contributions to the pension

plan on its prior California tax returns. But equity in this sense is not a concern of the UDITPA. It is, instead, the domain of the tax benefit rule, a judicially developed principle that cancels out an earlier deduction when careful examination shows that a later event is fundamentally inconsistent with the premise on which the deduction was initially based. (*Hillsboro National Bank v. Commissioner* (1983) 460 U.S. 370, 373, 383 [103 S.Ct. 1134, 1138, 1143, 75 L.Ed.2d 130].)