UNION CARBIDE CORP. v. OFFERMAN

[132 N.C. App. 665 (1999)]

---

UNION CARBIDE CORPORATION, Plaintiff v. MURIEL K. OFFERMAN, Secretary of Revenue, Defendant

No. COA97-956

(Filed 6 April 1999)

**Taxation— nonbusiness income—reverted pension funds**

Reverted funds from an overfunded pension plan, used to avoid a hostile takeover, constituted nonbusiness income because the reversion did not occur in the regular course of the corporation's trade or business (the transactional test) and there was no evidence that the pension plan was essential to the business's regular course of manufacturing and selling chemicals (the functional test). N.C.G.S. § 105-267.

Judge HORTON dissenting.

UNION CARBIDE CORP. v. OFFERMAN

[132 N.C. App. 665 (1999)]

Reconsidered in light of *Polaroid Corp. v. Offerman*, 349 N.C. 290, 507 S.E.2d 284 (1998), pursuant to 30 December 1998 order of the North Carolina Supreme Court. Originally heard in the Court of Appeals 19 March 1998.

*Alston & Bird, LLP, by Jasper L. Cummings, Jr.; Morrison & Foerster, by Paul H. Frankel; and Union Carbide Corporation, by Jerry L. Robinson, for plaintiff-appellee.*

*Attorney General Michael F. Easley, by Assistant Attorney General Kay Linn Miller Hobart, for defendant-appellant.*

LEWIS, Judge.

Pursuant to the Supreme Court's order we have reconsidered the issues presented, and we affirm our prior decision.

Plaintiff Union Carbide Corporation is a New York corporation domiciled in Connecticut and qualified to do business in North Carolina. Its principal business is the manufacture and sale of chemical products. Fearing a hostile takeover after a 1984 chemical gas leak in Bhopal, India, Union Carbide adopted a restructuring plan designed to increase stock prices. In 1985, Union Carbide's defined benefit pension plan trust held more assets than legally necessary to provide benefits to Union Carbide employees; it was substantially overfunded because of better than expected investment returns. Although Union Carbide had some input in investment decisions, it did not own or manage the pension plan trust, and individual employees were the beneficiaries of the plan. As part of the corporate restructuring, Union Carbide effected a reversion of pension plan funds from the overfunded pension plan. Federal law permits such reversions under certain circumstances, and Union Carbide sought and received permission to effect a reversion of the excess funds by removing part of the pension trust's assets and creating a trust for a new plan. Union Carbide used the removed assets to purchase annuities to pay for employee benefits. The excess funds after the annuity purchase ($500 million) were used to buy the company's stock. Union Carbide thus used a reversion from the overfunded pension plan to avoid a hostile takeover.

Union Carbide classified the $500 million as nonbusiness income under N.C. Gen. Stat. § 105-130.4(a)(1) (1985) and allocated the entire amount to Connecticut for taxation there. The state of North Carolina

reclassified the reversionary income as business income and levied tax on the $500 million. Union Carbide brought this action under N.C. Gen. Stat. § 105-267 (1986), seeking a refund of taxes paid. In our first decision, we addressed three issues: whether the reversion was business income to Union Carbide, whether Union Carbide made timely protest, and whether interest was properly awarded. The latter two parts of our decision are unaffected by the recent *Polaroid II* decision, and we decline to revisit them in the absence of a mandate to do so. Accordingly, the lone issue we decide is whether the pension plan reversion income is properly classified as business income or nonbusiness income under the two-prong test of *Polaroid II*. We hold that the reversionary income is nonbusiness income, and we affirm our prior decision.

The statutory definition of business income has not changed since 1985. Business income is

> income arising from transactions and activity in the regular course of the corporation's trade or business and includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute integral parts of the corporation's regular trade or business operations.

N.C. Gen. Stat. § 105-130.4 (a)(1) (1997). Nonbusiness income is "all income other than business income." N.C. Gen. Stat. § 105-130.4(a)(5) (1997). Our previous *Union Carbide* decision was based squarely on our decision in *Polaroid Corp. v. Offerman*, 128 N.C. App. 422, 496 S.E.2d 399 (*Polaroid I*), *rev'd*, 349 N.C. 290, 507 S.E.2d 284 (*Polaroid II*) (1998), and as such we applied only the transactional test in determining that the reversion was non-business income. Pursuant to *Polaroid II*, however, we must consider two tests for business income—the transactional test and the functional test—in determining if the reversion is business income. *See Polaroid II*, 349 N.C. at 301, 507 S.E.2d at 293.

The first clause of the definition of business income creates the transactional test. *See Polaroid II*, 349 N.C. 295, 507 S.E.2d at 289. Three aspects of the income must be considered under this test: "the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income." *Id.* The main inquiry "revolves around the nature of the particular *transaction* giving rise to the income." *Id.* (emphasis added). In our previous *Union Carbide* opinion, we determined that the reversion of

excess pension funds, rather than the operation of the pension plan itself, was the transaction that created income. The removal of funds from an overfunded pension plan by Union Carbide was a rare and extraordinary event; the evidence indicates no such removal occurred before or since the reversion at issue. As such, the reversion to Union Carbide did not occur in the "regular course of the corporation's trade or business." N.C. Gen. Stat. § 105-130.4 (a)(1). The reversion is not business income under the transactional test.

We now address for the first time whether the monies received from the reversion of pension plan funds constitute business income under the second clause of the definition, the functional test. *Polaroid II* directs that the definition of business income is to be read grammatically as follows: "[business income] includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute integral parts of the corporation's regular trade or business operations." *Id.* at 298, 507 S.E.2d at 290-91. *Polaroid II* explains the test in differing ways, however. First, "[u]nder the functional test, income is classified as business income if it arises from the acquisition, management, and/or disposition of an asset that was *used* by the taxpayer in the *regular course* of business." *Polaroid II* at 296, 507 S.E.2d at 289 (emphasis added). Later, we see another phrasing, directing us that "reading the second clause as a whole, business income includes income obtained from acquiring, managing, and/or disposing of property which is *essential* to the corporation's business *operation*." *Id.* at 301, 507 S.E.2d at 292-93 (emphasis added). We believe that the second version, which follows more closely the terms of our statute, is the true directive intended by the Supreme Court, and we will apply that interpretation.

Under the functional test, the extraordinary or infrequent nature of the event is irrelevant. *Id.* at 296, 507 S.E.2d at 289. The relevant inquiry addresses the character of the *property* that generated the income; extraordinary transactions may generate business income if the relevant asset was an integral part of the corporation's regular trade or business. *Id.* at 296, 507 S.E.2d at 289-90. *Polaroid II* further explains the functional test and says that "the phrase 'acquisition, management, and/or disposition' contemplates the indicia of owning corporate property." *Id.* at 301, 507 S.E.2d at 292. Moreover, "integral" means "essential to completeness." *Id.* Therefore, we discern three important inquiries in determining if income is business income under the functional test as set forth in *Polaroid II*: (1) whether there

are indicia of corporate ownership of the property; and (2) whether the property is "essential to completeness" of the (3) regular trade or business. *Id.* at 301, 507 S.E.2d at 292-93.

The State asserts that *Polaroid II*, in finding that the patent infringement suit proceeds were business income, is dispositive of this case. We disagree. In *Polaroid I* and *Polaroid II*, there was no dispute about the ownership or the integral nature of the patents. Indeed, Polaroid's primary source of income was sale of products on which the corporation owned patents. As such, Polaroid owned the property at issue, and the patents were integral to the regular course of Polaroid's business. Each of the three factors above was satisfied, and the income was found to be business income under the functional test.

Here, however, Union Carbide did not own any interest in the pension plan trust. Union Carbide's only role was a legally created one of fiduciary; the trust was held and managed by a trustee and the beneficiaries were individual employees and retirees. Furthermore, there is no evidence that the pension plan was or is essential to Union Carbide's chemical business. It was not legally mandated; its creation by Union Carbide was voluntary. A pension may be an attractive aspect of a compensation package, but it is not indispensable to operating a profitable chemical business. And, unlike Polaroid which relied on its patents to create income in its regular course of business, Union Carbide does not rely on its employees' pension plan to create corporate income.

Therefore, we hold that there is no evidence that Union Carbide's pension plan was essential to its regular course of manufacturing and selling chemicals. As such, any income derived from the management, acquisition, or disposition of it is nonbusiness income to Union Carbide under the functional test. Since the income also is nonbusiness income under the transactional test, we affirm our prior decision in full.

Affirmed.

Judge GREENE concurs.

Judge HORTON dissents.

Judge HORTON dissenting.

I respectfully dissent from the conclusion of the majority that the reverted funds from the Union Carbide pension plan are the "non-business" income of Union Carbide and thus not taxable by North Carolina.

Union Carbide has been qualified to do business in North Carolina since 1949. Since 1951, it has maintained a defined-benefit pension plan (the plan) for the benefit of its employees. The plan is non-contributory in that the employees do not contribute a portion of their wages to the plan. Instead, Union Carbide makes substantial annual contributions to the plan entirely from its general business income. For example, during the years 1978 through 1985, Union Carbide contributed a total of $1.1 billion to the plan. The plan is "qualified" under the Internal Revenue Code, so that all contributions to the plan are deductible from corporate income, and thus are not taxed either by the federal or state governments. Although the funds in the plan are held by a trustee, Union Carbide retained the right to make investment decisions as a fiduciary, subject to the limitations imposed by the Employee Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* Further, under appropriate circumstances, Union Carbide was entitled to the return of excess funds in the plan, either during the life of the plan or upon its termination. As the result of corporate restructuring to avoid a hostile takeover following the Bhopal, India, disaster, Union Carbide recaptured $500 million of its pension plan contributions. It now argues, and the majority agree, that the reverted pension fund contributions, originally from corporate business income and deducted as business expenses, were somehow transmuted into non-business income on which no income tax is due to North Carolina, one of the states in which Union Carbide does business.

N.C. Gen. Stat. § 105-130.4(a)(1) (Cum. Supp. 1998), which defines business income, contains both "transactional" and "functional" tests which may be applied to determine whether a particular item of income received by a corporation is "business" or "non-business." *Polaroid Corp. v. Offerman*, 349 N.C. 290, 295, 507 S.E.2d 284, 289 (1998). The distinction between business and non-business income for tax purposes is critical. A multi-state corporation pays tax on its business income to the several states in which it does business, using a formula based on its contacts with the various states to determine the amount of tax due each. However, where

**UNION CARBIDE CORP. v. OFFERMAN**

[132 N.C. App. 665 (1999)]

income is non-business income, a corporation only pays tax on the income to its home state.

In this case, Union Carbide classified the entire $500 million from its pension plan as non-business income and allocated it to Connecticut. In determining its Connecticut tax liability, Union Carbide treated the income as "apportionable unitary income," apportioning it among all states in which it does business. Under Union Carbide's classification of the funds as non-business, no state other than Connecticut was paid state income tax on the reverted funds. Union Carbide did report, however, the entire $500 million as ordinary income for federal income tax purposes.

I do agree with the majority that the reversion of pension funds to Union Carbide does not satisfy the transactional test, because it was not in the "regular course of the corporation's trade or business." N.C. Gen. Stat. § 105-130.4(a)(1). Under the functional test, however, the second part of the statutory definition states that business income includes income from property "if the acquisition, management, and/or disposition of the property constitute integral parts of the corporation's regular . . . business operations." *Id.*

In the case before us, Union Carbide argues that the pension plan was not the property of the corporation nor was it integral to its operation. The majority agree, stressing that the business of the corporation was making chemicals; not operating pension plans. That argument loses sight of the fact that it is to the benefit of any business to attract and retain qualified and loyal employees. That goal is clearly an integral part of the successful operation of any business. The pension plan discussed in this case is a part of the Union Carbide employees' total compensation package, designed not only to compensate employees for their work, but to assist them with retirement planning and to assist the company in retaining its experienced employees. Under any commonly accepted meaning of the term, operation of the Union Carbide pension plan is integral, or essential, to its business operations. Indeed, to use the language of the Internal Revenue Code, Union Carbide deducted its contributions to the plan and the related costs of operation of the plan as ordinary and necessary business expenses. Having certified its contributions and the expenses of operation of the plan as being necessary expenses in the operation of its business in order that such expenses might be deducted from income, Union Carbide may not now contend that the operation of the pension plan was not integral, or necessary, to its business operations.

Furthermore, Union Carbide had a sufficient ownership interest in the pension fund to satisfy the "acquisition, management, and/or disposition" portion of the functional test. As required by federal law, the plan funds were held by a trustee. Union Carbide retained certain powers as a fiduciary to direct investment of plan funds, subject to the limitations placed on fiduciaries by ERISA. Union Carbide also had the right under some circumstances to seek a reversion of excess funds in the pension fund. It received permission to exercise that right in this case and did so. A part of the original plan's assets were removed and a new trust created for a plan to cover some retired employees. After purchasing annuities to guarantee retirement funds for the retired employees at the promised levels, $500 million was left over and was used by Union Carbide for corporate purposes. At all times, Union Carbide had the right to seek permission to withdraw excess funds from the plan. That contingent right, together with the right of Union Carbide to direct investments in the plan, is sufficient to demonstrate "the indicia of owning corporate property" contemplated by our Supreme Court in *Polaroid*, 349 N.C. at 301, 507 S.E.2d at 292.

The result I would reach is not fundamentally unfair to this corporate taxpayer. From 1951 to 1985, Union Carbide earned sums from its business operations which were subject to taxation as general *business* income. It deducted its contributions from business income to the pension plan as *business* expenses dollar-for-dollar, so that the contributions were not taxed. It has now recaptured a substantial portion of those funds and classified them as *non-business* income in order to avoid paying state income taxes on the reverted funds to any state except Connecticut. North Carolina seeks only to tax that portion of the reverted funds which represent Union Carbide's contacts with this state in the same fashion other business income is taxed. That is neither unfair nor unconstitutional. I vote to reverse.