UNION CARBIDE CORPORATION v. MURIEL K. OFFERMAN, Secretary of Revenue

No. 453A98-2

(Filed 4 February 2000)

**Taxation— reverted pension funds—functional test—nonbusiness income**

Reverted funds from a corporation's overfunded pension plan resulting from gains on investment do not constitute taxable business income under the "functional test" because the corporation did not acquire, manage, or dispose of any corporate property but held only a contingent property right in the excess funds in the event of a plan termination; the contingent property right was not integral or essential to the corporation's business of making and selling alloys and chemicals; and the assets of the pension fund were not used to generate income in the regular business operations. Rather, the reverted funds were investment income taxable by the corporation's domicile state. N.C.G.S. § 105-130.4(a)(1).

Justice Lake dissenting in part.

Justice Freeman joins in this dissenting opinion.

Justice Martin did not participate in the consideration or decision of this case.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 132 N.C. App. 665, 513 S.E.2d 341 (1999), after reconsideration in light of *Polaroid Corp. v. Offerman*, 349 N.C. 290, 507 S.E.2d 284 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 671 (1999), affirming its prior, unpublished decision, 130 N.C. App. 761, 508 S.E.2d 847 (1998), which affirmed in part, reversed in part, and remanded summary judgment for plaintiff entered 5 May 1997 by Farmer, J., in Superior Court, Wake County. Heard in the Supreme Court 12 October 1999.

*Alston & Bird LLP, by Jasper L. Cummings, Jr.; and Morrison & Foerster, by Paul H. Frankel, pro hac vice, for plaintiff-appellee.*

*Michael F. Easley, Attorney General, by Kay Linn Miller Hobart, Assistant Attorney General, for defendant-appellant.*

*Multistate Tax Commission, by Paull Mines, General Counsel, and Roxanne Bland, Counsel, amicus curiae.*

*Womble Carlyle Sandridge & Rice, P.L.L.C., by Samuel M. Taylor, on behalf of Committee on State Taxation, amicus curiae.*

WAINWRIGHT, Justice.

Union Carbide Corporation ("Union Carbide") is chartered under the laws of the State of New York, having its principal place of business in Danbury, Connecticut. Union Carbide manufactures and sells alloys, chemicals, industrial gases, and plastics. A portion of this business is administered in North Carolina.

Since 1951, Union Carbide has maintained and is the sponsor of a pension plan for its employees. This plan is a qualified plan under the applicable Internal Revenue Code provisions. *See* 26 U.S.C. § 401(a) (1982 & Supp. 1985). The pension plan defined benefits to be received by Union Carbide employees upon retirement and employed a trust fund from which all the obligations would be paid. Union Carbide funded the pension plan through contributions from its general business earnings in amounts based on the expected needs of the plan to meet its obligations to its employees.

In 1984, there was a catastrophic gas leak at Union Carbide's facility in Bhopal, India. As a result, Union Carbide's stock prices plummeted. Union Carbide adopted a restructuring plan in order to prevent a hostile takeover, which could have resulted in significant layoffs. The restructuring plan consisted of "spinning off" excess funds from the pension plan not needed to cover benefits for current employees, purchasing annuities with the spun-off assets to pay benefits to retired employees, and distributing the remainder to shareholders to increase stock prices.

In 1985, actuarial consultants for the pension plan determined the plan was over funded because the trust's assets substantially exceeded the value of benefits earned by employees covered by the plan. The plan was over funded largely due to superior investment decisions. In situations where there is an over-funded plan, the Internal Revenue Code allows excess pension funds to be reverted to the plan sponsor, here Union Carbide. 26 C.F.R. § 1.401-2(b)(1) (1985). In December 1985, Union Carbide obtained the necessary authorization to cause a reversion of excess funds from the pension plan.

UNION CARBIDE CORP. v. OFFERMAN

[351 N.C. 310 (2000)]

Union Carbide used a portion of the reverted funds to purchase annuities to pay benefits to retired employees. A balance of five hundred million dollars of the funds reverted to Union Carbide. Union Carbide, on its 1985 federal tax return, recognized the reverted funds as ordinary income for federal tax purposes. Union Carbide reported the reverted funds as nonbusiness, nontaxable income on its 1985 corporate tax return in North Carolina and allocated the reverted income entirely to Connecticut, its state of domicile.

The North Carolina Department of Revenue (DOR) audited Union Carbide's corporate tax return and reclassified the reverted funds as business income, apportionable to North Carolina pursuant to N.C.G.S. § 105-130.4(i). DOR's tax assessment included the tax owed plus interest and a penalty. On 17 November 1992, Union Carbide paid DOR $243,114.14, and on 8 April 1996, Union Carbide paid DOR $517,115.35, for a total payment of $760,229.49. Thereafter, on 17 July 1996, Union Carbide filed suit to obtain a refund of the taxes paid.

Both Union Carbide and DOR moved for summary judgment in Wake County Superior Court. The trial court held there were no genuine issues of material fact, granted Union Carbide's motion for summary judgment, and ordered DOR to pay plaintiff $760,229.49 with interest from the dates of payment.

DOR appealed to the Court of Appeals from the order granting Union Carbide's motion for summary judgment and denying DOR's motion for summary judgment. In an unpublished opinion, the Court of Appeals held, *inter alia*, the reverted funds were not business income to Union Carbide under the "transactional test" defined in *Polaroid Corp. v. Offerman*, 128 N.C. App. 422, 496 S.E.2d 399 (1998) (*Polaroid I*), because the reversion of excess pension plan funds was not a part of Union Carbide's regular trade or business. *Union Carbide Corp. v. Offerman*, 130 N.C. App. 761, 508 S.E.2d 847 (1998) (*Union Carbide I*).

This Court allowed review of *Union Carbide I* for the limited purpose of remanding to the Court of Appeals for reconsideration in light of *Polaroid Corp. v. Offerman*, 349 N.C. 290, 507 S.E.2d 284 (1998) (*Polaroid II*), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 671 (1999), which identified a "transactional test" and a "functional test" in the definition of "business income." *Union Carbide Corp. v. Offerman*, 349 N.C. 534, —— S.E.2d —— (1998) (*Union Carbide II*).

## UNION CARBIDE CORP. v. OFFERMAN

[351 N.C. 310 (2000)]

A brief review of the *Polaroid* case is instructive in the instant case. In *Polaroid I*, Polaroid Corporation (Polaroid) collected a judgment against Eastman Kodak Corporation (Kodak) for Kodak's infringement of Polaroid's patents. *Polaroid I*, 128 N.C. App. at 423, 496 S.E.2d at 400. Polaroid classified the judgment proceeds as "nonbusiness income" for income tax purposes. *Id*. DOR disagreed and reclassified the judgment proceeds as "business income" taxable in North Carolina. *Id*. Polaroid paid the assessment and filed suit to obtain a refund. *Id*. The trial court granted summary judgment for DOR. *Id*.

On appeal, the Court of Appeals reversed and ordered summary judgment in favor of Polaroid. The Court of Appeals based its decision on the definition of "business income," which provides:

income arising from transactions and activity in the *regular course* of the corporation's *trade or business* and includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute *integral* parts of *the corporation's regular trade or business operations*.

N.C.G.S. § 105-130.4(a)(1) (1999) (emphasis added). The Court of Appeals held business income "aris[es] from transactions and activity in the regular course of the corporation's trade or business" (the "transactional test"), while the phrase beginning with "and includes" provides examples of what fits within the definition. *Polaroid I*, 128 N.C. App. at 424-25, 496 S.E.2d at 400-01. Utilizing this interpretation, the Court of Appeals ordered a refund for Polaroid. *Id*. at 427, 496 S.E.2d at 402.

On review of *Polaroid I*, this Court reversed the Court of Appeals, holding the portion of the definition after the words "and includes," was a "functional test," and was an additional, distinct test for determining business income, as opposed to examples of business income. *Polaroid II*, 349 N.C. at 297-301, 507 S.E.2d at 290-93. As a result, business income is now classified according to the "transactional test" and the "functional test."

On remand, in the instant case, the Court of Appeals addressed only the issue of whether the reverted funds are business income or nonbusiness income under the two-prong test of *Polaroid II*. *See Union Carbide Corp. v. Offerman*, 132 N.C. App. 665, 513 S.E.2d 341

(1999) (*Union Carbide III*). The Court of Appeals unanimously held the reverted funds were not business income under the "transactional test" because: (1) the reversion of excess funds, not the operation of the pension plan, created the income; (2) the removal of funds from the over-funded pension plan was a rare and extraordinary event; and (3) no such removal occurred before or since the reversion in 1985. *Id.* at 667-68, 513 S.E.2d at 343. A majority of the Court of Appeals also held any income derived from the reverted funds was nonbusiness income under the "functional test" defined in *Polaroid II* because: (1) Union Carbide did not own any interest in the pension plan trust; (2) the pension plan, while an aspect of a compensation package, was not essential to Union Carbide's chemical business; and (3) Union Carbide did not rely on the employee pension plan to create corporate income. *Id.* at 669, 513 S.E.2d at 344. The dissent stated the income from the reverted funds was business income under the functional test because: (1) the goal of attracting and retaining qualified employees is clearly integral to the successful operation of a business; (2) Union Carbide, in deducting its contributions as "necessary business expenses," cannot later contend the pension plan was not necessary to its business; (3) Union Carbide's rights to withdraw excess funds and to direct investments satisfy the "acquisition, management, and/or disposition" portion of the functional test; and (4) this result is not fundamentally unfair because Union Carbide deducted the contributions from business income but then recaptured a substantial portion of the funds and classified them as nonbusiness income, with North Carolina seeking to tax only the portion representing contacts within North Carolina. *Id.* at 671-72, 513 S.E.2d at 345-46 (Horton, J., dissenting).

In DOR's appeal as of right to this Court, our review is limited to the sole issue presented which is whether the entire reversion of pension plan contributions constitutes business income under the "functional test" as first described in *Polaroid II*.

Following our discussion in *Polaroid II*, the instant case is, in essence, a case of statutory construction. It is well settled that " '[w]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give [the statute] its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein.' " *State v. Camp*, 286 N.C. 148, 152, 209 S.E.2d 754, 756 (1974) (quoting 7 John M. Strong, North Carolina Index 2d *Statutes* § 5 (1968)).

An important function of statutory construction "is to ensure accomplishment of the legislative intent." *Polaroid II*, 349 N.C. at 297, 507 S.E.2d at 290. We first look to the words chosen by the legislature and "if they are clear and unambiguous within the context of the statute, they are to be given their plain and ordinary meanings." *Brown v. Flowe*, 349 N.C. 520, 522, 507 S.E.2d 894, 896 (1998). In *Polaroid II*, this Court analyzed the plain language of N.C.G.S. § 105-130.4(a)(1) and concluded the decision of the General Assembly to utilize different language in the two clauses of the statute evidences its intention to define business income with two distinct tests. *Polaroid II*, 349 N.C. at 298, 507 S.E.2d at 291. Accordingly, this Court held the plain language of N.C.G.S. § 105-130.4(a)(1) provides for a "transactional test" and a "functional test" in determining whether certain funds are business income. *Id.* at 301, 507 S.E.2d at 293.

The 1985 version of N.C.G.S. § 105-130.4(a)(1) is identical to the 1989 statute analyzed in *Polaroid II*. Thus, as only the application of the "functional test" is here on review, we analyze the present fact situation under the "functional test" described in *Polaroid II*.

Under the "functional test," business income "includes income from tangible and intangible property if the acquisition, management, and/or disposition of the property constitute *integral parts of the corporation's regular trade or business operations.*" N.C.G.S. § 105-130.4(a)(1) (emphasis added).

In analyzing the plain language of N.C.G.S. § 105-130.4(a)(1), this Court in *Polaroid II* first noted "the phrase 'acquisition, management, and/or disposition' contemplates the indicia of owning corporate property.'" *Polaroid II*, 349 N.C. at 301, 507 S.E.2d at 292. The pension plan in the instant case was not Union Carbide's property. Union Carbide was the plan's sponsor, not its owner. Therefore, Union Carbide did not acquire, manage, and/or dispose of any corporate property. Union Carbide held only a contingent property right in the excess funds in the event of a plan termination.

Additionally, in *Polaroid II*, we defined "integral" as " 'essential to completeness.' " *Id.* (quoting *Merriam-Webster's Collegiate Dictionary* 607 (10th ed. 1993)). In the instant case, the contingent property right was not integral or essential to Union Carbide's business of making and selling alloys and chemicals.

Moreover, the phrase "regular trade or business operations" refers to business operations done in a recurring manner, or at fixed

or uniform intervals. *See Merriam-Webster's Collegiate Dictionary* 985 (10th ed. 1999). In the instant case, the assets of the pension plan were not used to generate income in the regular business operations. The assets were not working capital. The assets were not used as collateral in borrowing. The assets were not actively traded. Finally, the assets were not relied upon to purchase equipment or support research and development. Thus, the reversion of excess funds by Union Carbide, a one-time occurrence, not a recurring event, was not part of Union Carbide's "regular trade or business operations."

In sum, the assets were not *essential* to Union Carbide's regular trade or business operations. The assets were merely surplus investment assets which were not needed to meet the obligations of the pension plan. Thus, Union Carbide's contingent property right in the excess pension plan funds does not meet the functional test of business income. The plan funds were not integral to Union Carbide's regular trade or business operations of making and selling alloys, chemicals, industrial gases, and plastics. The plan funds, which produced the income at issue, functioned as an investment for the benefit of Union Carbide employees.

As the reverted funds do not constitute business income under the transactional test or the functional test, Union Carbide properly classified the funds as nonbusiness income on its North Carolina tax return. The dissent below points out that Union Carbide deducted its contributions as "necessary business expenses," thereby reducing the amount of business income subject to state and federal taxation, and should not be able to regain a substantial portion of the funds and claim they were not integral to its business operations. However, Union Carbide reported the reverted excess funds as ordinary income on its federal tax return and as taxable income on its Connecticut tax return, the state of domicile. The reverted funds are not business income, but rather are investment income taxable by the domicile state. Moreover, whether or not the funds were classified as "necessary business expenses," they were not used "in the regular course of the corporation's trade or business" and were not "integral" to "the corporation's regular trade or business operations" in North Carolina. Therefore, Union Carbide did not have to pay income tax on the reverted funds in North Carolina.

If, assuming *arguendo*, the pension plan was Union Carbide's property, then the acquisition, management, and/or disposition of the pension plan did not constitute an integral part of Union Carbide's

## UNION CARBIDE CORP. v. OFFERMAN

[351 N.C. 310 (2000)]

regular trade or business operations. While the plan may have assisted Union Carbide in attracting more qualified employees, the pension plan itself is not essential to Union Carbide's regular trade or business operations of producing alloys and chemicals. Moreover, while there exists a possibility that some of the reverted funds consisted of principle which had been deducted as business expenses by Union Carbide, rather than merely gains on investment, we are limited to the matters of record and are unable to apportion any unknown amounts.

Accordingly, under the plain language of the functional test of N.C.G.S. § 105-130.4(a)(1), the reversion of excess pension plan funds was not business income to Union Carbide. For these reasons, the decision of the Court of Appeals is

AFFIRMED.

Justice MARTIN did not participate in the consideration or decision of this case.

Justice LAKE dissenting in part.

Although I concur with the majority's opinion that reverted pension funds resulting from gains on investment are nonbusiness income, I do not agree that this conclusion should be broadly extended to all pension fund reversion dollars.

In applying the "transactional test" or the "functional test" in determining whether income is business or nonbusiness income, it is important to establish the origin of the income. In its opinion, the majority states that Union Carbide's plan was over funded "largely due to superior investment decisions." It is my opinion that to the extent the flow-back of the funds resulted from an occurrence other than gains on investment, such as corporate restructuring, pension plan restructuring or funding in excess of the plan's requirements, those dollars should be "flowed back" to the state from which they had previously been deducted as business expense, thereby decreasing taxable income in that state. A flow-back in this manner would not only allow for the consistent treatment of dollars as "business expense" when deducted and "business income" when flowed back, but would ensure that corporations cannot manipulate their earnings by redirecting reversion funds to a state with a lower state tax rate.

**SPRUILL v. LAKE PHELPS VOL. FIRE DEP'T, INC.**

[351 N.C. 318 (2000)]

In the instant case, it does not appear that all of Union Carbide's reversion funds resulted from gains on investment. Therefore, it is my opinion that the case should be remanded for a determination, to the extent possible, of what portion of the reversion resulted from gains on investment and what portion resulted from a flow-back of previously deducted business expense. The portion previously deducted as business expense in North Carolina should be flowed back to this state as taxable income.

Justice FREEMAN joins in this dissenting opinion.