[No. A107209. First Dist., Div. Four. Oct. 17, 2005.]

JIM BEAM BRANDS CO., Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

**COUNSEL**

Silverstein & Pomerantz, Edwin Park Antolin, Amy L. Silverstein; Horwood Marcus & Berk, Jordan M. Goodman and Brian L. Browdy for Plaintiff and Appellant.

Morrison & Foerster, Charles J. Moll III and William Hays Weissman for Better Communications, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer, Attorney General, William Carter, Anne Michelle Burr and George C. Spanos, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**SEPULVEDA, Acting P. J.**—Jim Beam Brands Co. (Jim Beam) appeals from a grant of summary judgment in favor of the Franchise Tax Board (FTB) in a tax refund action. Jim Beam brought the action below after the State Board of Equalization (SBE) ruled that the gain from Jim Beam's sale of the stock of a wholly-owned subsidiary constituted " '[b]usiness income' " within the meaning of Revenue and Taxation Code section 25120, subdivision (a). The trial court sustained the SBE's decision and held that income from the sale was apportionable to California. In this court, Jim Beam argues that the income from the sale of its subsidiary does not qualify as "business income" under the statute. In the alternative, Jim Beam contends that even if the gain was business income, it is entitled to an adjustment of its tax basis in the stock to reflect certain undistributed earnings and profits. We disagree with both arguments and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Jim Beam is a distiller of bourbon whiskey. It also produces, or imports, and markets a wide variety of distilled spirits, including bourbon and other whiskeys, cordials, gin, and vodka. Prior to December 1987, Jim Beam was part of a unitary business group[1] that consisted of Jim Beam, Taylor Food Products, Inc. (Taylor Food), Clear Spring Distilling Corporation (Clear Spring), Regal China Corporation, Berkeley Manufacturing Company, and Wood Terminal Company. In addition to Jim Beam's alcoholic beverage business, through its subsidiaries, Jim Beam engaged in other enterprises. Regal China Corporation and Berkeley Manufacturing Company produced and marketed decanter bottles, china lamp bases, and specialty ceramic items. Wood Terminal Company was engaged in leasing trucks. In the court below, the parties stipulated that Taylor Food produced various cocktail mixes, tomato juice, and margarita salt. It also imported and distributed mineral water.

Jim Beam owned all of the stock of Clear Spring, and Clear Spring in turn owned the stock of Taylor Food. Prior to its sale, Taylor Food's operations were an integral part of Jim Beam's regular trade or business operations. Income from Taylor Food's business was combined with the income from other members of Jim Beam's unitary group and apportioned as part of the

---

[1] "A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities." (*Citicorp North American, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1411, fn. 5 [100 Cal.Rptr.2d 509] (*Citicorp*).)

income of the unitary business group. During the time that Taylor Food was part of Jim Beam's unitary business, its income was reported to California as apportionable business income and taxed by this state. Significantly for the purposes of this case, the parties stipulated that Jim Beam's acquisition, control, and use of Taylor Food contributed materially to Jim Beam's production of business income prior to the sale of Taylor Food.

In December 1987, through Clear Spring, Jim Beam sold all of its stock in Taylor Food. Jim Beam's stated reason for selling Taylor Food was that the subsidiary no longer fit the long-range strategic plans of American Brands, Inc., Jim Beam's parent company and sole shareholder.[2] Clear Spring realized a gain on the sale of its Taylor Food stock, and it distributed the entire proceeds of the sale to its parent, Jim Beam, which in turn distributed the proceeds to American Brands. Clear Spring classified the gain as "nonbusiness income" and allocated 100 percent of the gain to Kentucky, the state of its domicile. Clear Spring reported a tax basis of $6,517,158 in its Taylor Food stock. This figure included $5,928,020 in undistributed Taylor Food earnings. For its part, Jim Beam reported the income from the sale of Taylor Food as "nonbusiness income" on its California franchise tax return for 1987.

The FTB audited Jim Beam's tax return for the 1987 tax year. Based on its audit, the FTB reclassified the income from the sale of Taylor Food as "business income." The FTB also reduced the basis in the Taylor Food stock without regard to the undistributed earnings, thus increasing the amount of income reported to California. The FTB then issued a notice of proposed assessment to Jim Beam, which Jim Beam timely protested. The FTB denied Jim Beam's protest and issued a notice affirming its proposed assessment.

Jim Beam appealed the matter to the SBE. After the SBE issued a decision sustaining the FTB's action, Jim Beam paid the proposed assessment and filed a claim for refund. The FTB denied Jim Beam's claim, and Jim Beam sued the FTB for a refund in San Francisco Superior Court. After stipulating to a number of facts pertinent to the legal issues presented, both parties filed motions for summary judgment. The superior court granted the FTB's motion for summary judgment and denied Jim Beam's motion. Jim Beam filed a timely appeal.

## DISCUSSION

Jim Beam presents two arguments in this appeal. First, it contends that the gain from the sale of Taylor Food does not fall within the definition of

---

[2] Although it was Jim Beam's parent, American Brands was not part of Jim Beam's unitary business group.

" '[b]usiness income' " in Revenue and Taxation Code section 25120, subdivision (a). Second, it argues that even if the proceeds from the sale of Taylor Food are business income, the amount of taxable gain should be offset by the extent to which the undistributed earnings of Taylor Food have already been taxed by California. We address these issues in turn.

## I.

### THE DEFINITION OF "BUSINESS INCOME."

#### A. *Standard of Review.*

■ This case presents an issue of statutory construction, and the parties agree that we review the question de novo. (See *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808] [appellate court exercises de novo review of ruling on summary judgment motion and underlying statutory construction issues].)
■ Although the courts bear the ultimate responsibility for the construction of the statute, we will accord great weight and respect to the administrative construction. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524–525 [106 Cal.Rptr.2d 548, 22 P.3d 324] (*Hoechst Celanese*) [relying on SBE decisions interpreting the statutory definition of "business income"].) Deference is appropriate where the administrative agency's expertise indicates that it has a comparative interpretive advantage over the courts. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) As this court noted in *Citicorp,* the SBE's "expertise in tax matters is not subject to dispute[.]" (*Citicorp, supra,* 83 Cal.App.4th at p. 1419.)

■ A healthy respect for the SBE's interpretation is particularly appropriate in this case. The definition of business income in Revenue and Taxation Code section 25120 mirrors section 1, subdivision (a) of the Uniform Division of Income for Tax Purposes Act. (7A pt. 1 West's U. Laws Ann. (2002) U. Div. of Income for Tax Purposes Act, § 1, p. 147 (UDITPA).) The drafters of UDITPA derived their definition of business income from an earlier line of SBE decisions. (*Hoechst Celanese, supra,* 25 Cal.4th at p. 523–524.) Thus, to the extent that they bear on the issue presented, the Supreme Court has suggested that SBE decisions predating California's enactment of UDITPA may be controlling, "because the Legislature presumably enacted the UDITPA with the understanding that it did not alter existing California [decisional] law." (25 Cal.4th at p. 535.)

#### B. *The Statutory Scheme.*

■ California is one of a number of states that have adopted UDITPA. California's version of the uniform act is found in Revenue and Taxation

Code sections 25120 through 25141. Under this statute, the income of multistate corporations is divided into either " '[b]usiness income' " or " '[n]onbusiness income.' " (Rev. & Tax. Code, § 25120, subds. (a) & (d).) Business income is apportionable to each state in which the corporation or unitary business group does business; nonbusiness income is allocable only to the taxpayer's commercial domicile. (*Hoechst Celanese, supra,* 25 Cal.4th at pp. 513, 518; *Citicorp, supra,* 83 Cal.App.4th at p. 1411.)

The statute defines the term "business income" as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (Rev. & Tax. Code, § 25120, subd. (a).) " 'Nonbusiness income' means all income other than business income." (*Id.,* subd. (d).)

In *Hoechst Celanese,* the Supreme Court held that section 25120 establishes both a "transactional test" and a "functional test" for business income. (*Hoechst Celanese, supra,* 25 Cal.4th at pp. 520–526.) Under the transactional test, the controlling factor for identifying business income is the nature of the income-producing transaction. (*Id.* at p. 526.) To generate business income under the transactional test, the transaction must occur in the regular course of the taxpayer's trade or business. (*Ibid.*) "[I]ncome arising from 'extraordinary' events, such as a 'complete liquidation [or] cessation of business,' cannot satisfy the transactional test." (*Id.* at pp. 526–527.) The functional test, in contrast, focuses on the income-producing property. (*Id.* at p. 527.) In applying the functional test, the "critical inquiry" is the "relationship between this property and the taxpayer's 'business operations.' " (*Ibid.*)

The parties agree that the income from the sale of Taylor Food is not business income under the transactional test. The issue before us is whether the sale of Taylor Food generated business income for Jim Beam's unitary business group under the statute's functional test. In *Hoechst Celanese, supra,* 25 Cal.4th 508, the Supreme Court both explained the operation of the functional test and provided a detailed interpretation of the statutory language that is at issue here. The Supreme Court's opinion in *Hoechst Celanese* therefore guides our decision in this case.

C. *The Gain from the Sale of Taylor Food is "Business Income" Under Revenue and Taxation Code Section 25120, Subdivision (a).*

In contending that the gain realized from the sale of Taylor Food is not business income under the statute, Jim Beam renews the arguments that it

made before the SBE. It contends that the "plain language" of Revenue and Taxation Code section 25120, subdivision (a) requires a finding of nonbusiness income because, Jim Beam asserts, the statute requires that the "acquisition, management, *and* disposition" of Taylor Food must each be integral to Jim Beam's regular trade or business operations. Furthermore, it relies on a number of cases from other UDITPA states that have held that the gains that result from the partial liquidation or cessation of a business are not business income under UDITPA.

The SBE rejected both of these arguments. Relying on its own earlier decisions, it disagreed with Jim Beam's "technical linguistic analysis" of the statute. It held that its prior decisions had essentially rejected Jim Beam's argument that there existed "an additional independent test for business income upon the disposition of assets[.]" The SBE quoted from *Appeal of Borden, Inc.* (Feb. 3, 1977) (1971–1978 Transfer Binder) Cal. Tax Rptr. (CCH) paragraph 205-615, pages 14,897-57 to 14,897-58 (*Borden*), in which it had held that " '[t]he underlying principle in these cases is that any income from assets which are integral parts of the unitary business is unitary income. It is appropriate that all returns from property which is developed or acquired and maintained through the resources of and in furtherance of the business should be attributed to the business as a whole.' " (*Ibid.*, quoting *Appeal of W.J. Voit Rubber Corp.* (May 12, 1964) (1962–1966 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 202-435, p. 12,443.)

The SBE also rejected Jim Beam's partial liquidation argument. It declined to follow case law from other UDITPA states that treat the gains realized from the liquidation of a line of business as nonbusiness income. The SBE concluded that acceptance of Jim Beam's argument would conflict with the results it had reached in cases with similar facts and with the rationale underlying those cases. (See *Appeal of Triangle Publications, Inc.* (June 27, 1984) (1981–1984 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 400-905, p. 23,346 (*Triangle Publications*) [rejecting argument that income from liquidation of separate corporate divisions is nonbusiness income].)

We hold that the SBE's construction of the statute was correct and that the gain from the sale of Taylor Food is business income under the statute's functional test.

### 1. *The Requirements of the Functional Test.*

In contrast to the transactional test, which focuses on the " 'nature of the particular transaction' that generates the income," the functional test

focuses on the income-producing *property.* (*Hoechst Celanese, supra,* 25 Cal.4th at pp. 526, 527.) According to our Supreme Court, the "critical inquiry" for purposes of the functional test is "the nature of the relationship between this property and the taxpayer's 'business operations.'" (*Id.* at p. 527.) The relationship necessary to a finding of business income is defined by the conditional clause of Revenue and Taxation Code section 25120, subdivision (a). (25 Cal.4th at p. 528.) That is, income from tangible and intangible property is business income "if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." (Rev. & Tax. Code, § 25120, subd. (a).)

As *Hoechst Celanese* explains, the statutory language requires essentially a two-part inquiry. First, the phrase " 'acquisition, management, and disposition' " directs us to examine "the taxpayer's interest in and power over the income-producing property." (*Hoechst Celanese, supra,* 25 Cal.4th at p. 528.) Second, if we conclude that the taxpayer has a sufficient interest in the income-producing property for the purposes of the statute, we next review whether "the taxpayer's control and use of the property [are] an 'integral part[] of the taxpayer's regular trade or business operations.'" (*Id.* at p. 529, quoting Rev. & Tax. Code, § 25120, subd. (a).)

Jim Beam concedes that the first requirement of the functional test is met. In its opening brief, it states that "[i]t is undisputed that Jim Beam 'acquired, managed, and disposed' of the stock of Taylor Food. Accordingly, the requirements of the first phrase are satisfied." Jim Beam disputes only the conclusion that its acquisition, management, and disposition of Taylor Food were integral to its regular trade or business operations. We therefore turn to that question.

### 2. *Jim Beam's Control and Use of Taylor Food Were an Integral Part of Its Regular Trade or Business Operations.*

Before the acquisition, management, and disposition of the property will be considered integral to the taxpayer's regular trade or business operations, "the taxpayer's *control and use of the property* must contribute materially to the taxpayer's production of business income so that the property becomes interwoven into and inseparable from the taxpayer's business." (*Hoechst Celanese, supra,* 25 Cal.4th at p. 529, italics added.) The statutory phrase " 'regular trade or business operations' " requires that "the taxpayer's control and use of the income-producing property . . . be part of the taxpayer's normal or typical business activities." (*Id.* at p. 530.) The word "regular" does not refer to the nature of the transaction, and thus "the

extraordinary nature or infrequency of the income-producing transaction is irrelevant." (*Ibid.*) A taxpayer's control and use of the property will be considered "integral" to its regular trade or business operations if there exists "an organic unity between the taxpayer's property and business activities whereby the property contributes materially to the taxpayer's production of business income." (*Ibid.*) Thus, the necessary "integral" relationship "exists when the taxpayer controls and uses the property to contribute materially to the taxpayer's production of business income." (*Id.* at p. 532.)

Here again, Jim Beam has essentially conceded that this portion of the statutory test is satisfied. In the court below, it stipulated that its "acquisition, control and use of Taylor Food contributed materially to taxpayer's production of business income." In addition, Jim Beam further stipulated that "[p]rior to the sale of Taylor Food, Taylor Food's business operations were an integral part of taxpayer's regular trade or business operations." As the FTB correctly argues, this falls squarely within the *Hoechst Celanese* definition of the term "integral." (See *Hoechst Celanese, supra,* 25 Cal.4th at p. 532.)

### 3. *The Disposition of the Proceeds of the Sale Does Not Affect the Finding of Business Income.*

Despite its stipulation, Jim Beam contends that the income from its sale of Taylor Food cannot be business income because, in Jim Beam's view, the statute requires that the "acquisition, management, and disposition" of Taylor Food must *each* be integral to its regular trade or business operations. Jim Beam argues that its disposition of Taylor Food "was wholly unrelated and did not 'contribute,' materially or otherwise, in any way to Jim Beam's unitary business." As evidence of this, Jim Beam cites the fact that all of the proceeds of the sale were distributed to American Brands, which was not part of Jim Beam's unitary business group. In addition, Jim Beam notes that Taylor Food was not a drag on earnings, was in fact profitable, and was sold only because it "no longer fit with the long-range strategic plans of American Brands[.]" Thus, according to Jim Beam, the sale of Taylor Food did not contribute to Jim Beam's business, and the disposition was not an integral part of Jim Beam's regular trade or business operations.

We reject this argument for a number of reasons. First, we agree with the FTB that this line of reasoning improperly focuses the analysis on the income-producing *transaction* rather than on the income-producing *property,* as *Hoechst Celanese* requires. As discussed earlier, the Supreme Court has made clear that the critical inquiry is "the nature of the relationship between

this property and the taxpayer's 'business operations.' " (*Hoechst Celanese, supra,* at p. 527.) The *Hoechst Celanese* analysis does not focus on the use of the proceeds of the disposition or on the reasons behind the sale.[3] (Accord, *Appeal of Occidental Petroleum Corporation* (June 21, 1983) (1981–1984 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 400-394, p. 22,616, fn. 3 (*Occidental Petroleum*) ["we do not attach any particular significance to the taxpayer's eventual use of the proceeds from stock sales"].) *Hoechst Celanese* makes clear that nothing more is required than what Jim Beam has already conceded—that its control and use of the property contributed materially to Jim Beam's production of business income. (*Hoechst Celanese, supra,* at p. 532.)

■ Second, Jim Beam's argument is based on a reading of the words "acquisition, management, and disposition" that cannot be squared with the interpretation given them by the Supreme Court. In *Hoechst Celanese,* the Supreme Court stated that "the phrase 'acquisition, management, and disposition of the property' establishes that the taxpayer must: (1) obtain some interest in and control over the property; (2) control or direct the use of the property; and (3) transfer, or have the power to transfer, control of that property in some manner." (*Hoechst Celanese, supra,* 25 Cal.4th at pp. 528–529.) This statutory language does not establish a requirement that each element—acquisition, management, and disposition—individually be integral to the taxpayer's regular trade or business operations before the proceeds from property will be held to be business income. Rather, the Supreme Court interpreted these words "to refer to the taxpayer's interest in and power over the income-producing property." (*Id.* at p. 528.) Thus, this language "encompasses the myriad of ways that corporations may control and use the rights and privileges commonly associated with property ownership." (*Id.* at p. 529.) Jim Beam's attempt to derive a three-part test from the phrase in question is simply inconsistent with our Supreme Court's interpretation of the statute. "Because the [Taylor Food business] contributed materially to [Jim Beam's] production of business income" prior to sale of the subsidiary, "the 'acquisition, management, and disposition of' [Taylor Food] 'constitute integral parts of' [Jim Beam's] 'business operations.' " (*Id.* at p. 536.)

---

[3] In its amicus curiae brief in support of Jim Beam, Better Communications, Inc. cites *Times Mirror Co. v. Franchise Tax Bd.* (1980) 102 Cal.App.3d 872, 877–878 [162 Cal.Rptr. 630] (*Times Mirror*) as support for its contention that the use of the proceeds of the sale is relevant to the business income analysis. Although *Times Mirror* did discuss the use of the proceeds of the disposition, amicus curiae's reading of that case is inconsistent with the manner in which both the Supreme Court and this court have understood its holding. (See *Hoechst Celanese, supra,* 25 Cal.4th at p. 533 [summarizing *Times Mirror* holding as "income from the taxpayer's sale of a subsidiary's stock was business income because the subsidiary generated business income"]; *Robert Half Internat., Inc. v. Franchise Tax Bd.* (1998) 66 Cal.App.4th 1020, 1027 [78 Cal.Rptr.2d 453] [*Times Mirror* "simply means that when parties stipulate that a corporation acquired and operated another corporation as part of its regular business operations, the sale of that corporation results in business income"].)

Finally, on a conceptual level, Jim Beam does not explain why property that admittedly generated unitary business income for years prior to its disposition should not also generate business income when it is sold. Such a position is at odds with the SBE's pre-UDITPA rule that " 'any income from assets which are integral parts of the unitary business is unitary income.' " (*Borden, supra,* (1971–1978 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 205-615, p. 14,897-58, quoting *Appeal of W.J. Voit Rubber Corp., supra,* (1962–1966 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 202-435, p. 12,443.) It is also inconsistent with the comments of the National Conference of Commissioners on Uniform State Laws explaining section 1 of UDITPA, the source of section 25120. As the Supreme Court noted in *Hoechst Celanese,* the comments "contemplate the apportionment of gains realized from *any* sale of property used in the taxpayer's trade or business." (*Hoechst Celanese, supra,* 25 Cal.4th at p. 531, italics added, citing Comrs. Coms., UDITPA, com. foll. § 1, subd. (a).) "Indeed, the comment ostensibly makes all income from the disposition of property used in the taxpayer's business apportionable even if the disposition does not occur 'in the regular course of the taxpayer's trade or business.' " (*Hoechst Celanese, supra,* at p. 524.)

We therefore conclude that the SBE was correct in rejecting Jim Beam's statutory construction argument. Consequently, this argument furnishes no basis for reversal of the trial court's grant of summary judgment to the FTB.

### D. *The Partial Liquidation Exception.*

Jim Beam argues that "the treatment of gains from a liquidation of a line of business followed by a distribution of the liquidation proceeds to the taxpayer's shareholders is an issue of first impression in California," and it urges that in such circumstances the gains should be treated as nonbusiness income. The SBE rejected this argument, and it refused Jim Beam's invitation to carve out what it termed a " 'partial liquidation exception' " to the functional test. In this court, Jim Beam contends that there is a "consensus" among courts in other UDITPA states holding that where the sale of an asset of a unitary business results in the cessation of that line of business activity, the proceeds from that sale are treated as nonbusiness income. In support of this argument, Jim Beam cites cases from six other states that have adopted UDITPA. All of these cases have concluded that the gains from the complete or partial liquidation of a business are nonbusiness income.[4]

---

[4] The cases upon which Jim Beam places principal reliance are *American States Insurance Co. v. Hamer* (2004) 352 Ill.App.3d 521 [816 N.E.2d 659, 287 Ill.Dec. 692]; *Blessing/White, Inc. v. Zehnder* (2002) 329 Ill.App.3d 714 [768 N.E.2d 332, 263 Ill.Dec. 572]; *May Dept. Stores v. Dept. of State Revenue* (Ind. Tax Ct. 2001) 749 N.E.2d 651; *McVean & Barlow, Inc. v. New Mexico Bureau of Rev.* (1975) 88 N.M. 521 [543 P.2d 489] (*McVean & Barlow*); *Lenox,*

■ At the outset, we note that the issue Jim Beam raises is not truly one of first impression. At least one California case has held that a corporation's sale of the stock of its subsidiary generates business income under Revenue and Tax Code section 25120, subdivision (a). (*Times Mirror, supra,* 102 Cal.App.3d at pp. 877–878 [holding that "proceeds, which include any capital gains income received by Times Mirror, constitute business income, as a matter of law"].) In addition, the SBE has confronted similar facts on more than one occasion, and it has uniformly held that the gains from the sale of a corporate subsidiary constitute business income. (*Triangle Publications, supra,* (1981–1984 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 400-905, at p. 23,346 [income from sale of corporate divisions, which allegedly resulted in liquidation of separate businesses, held business income]; *Occidental Petroleum, supra,* (1981–1984 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 400-394, at pp. 22,614–22,616 [gain from sale of shares in unitary subsidiary held business income].) Thus to the extent that California decisions have considered the question, they have supported the view that the sale of stock in a unitary subsidiary is business income under the statute.

Moreover, even in the absence of the California decisions just cited, we could not follow the out-of-state cases Jim Beam cites because an examination of their reasoning demonstrates that it conflicts with the SBE's long-standing interpretation of the term "business income" and with the Supreme Court's opinion in *Hoechst Celanese.* We cannot accept Jim Beam's argument without repudiating the analysis underlying California's functional test.

The earliest case upon which Jim Beam relies is *McVean & Barlow.* In that case, the taxpayer had been engaged for many years in the business of laying both large and small diameter pipe. (*McVean & Barlow, supra,* 543 P.2d at p. 490.) It then liquidated its large diameter pipeline business. (*Ibid.*) The New Mexico Court of Appeals held that income from the taxpayer's sale of its large-diameter pipeline business was not business income under New Mexico's version of UDITPA. (*McVean v. Barlow,* at p. 492.) In so holding, *McVean & Barlow* relied on the Kansas Supreme Court's opinion in *Western Natural Gas Company v. McDonald* (1968) 202 Kan. 98 [446 P.2d 781] (*Western Natural Gas*). (*McVean & Barlow, supra,* at p. 491.) To support its interpretation of the term "business income," the *McVean & Barlow* court quoted a passage from *Western Natural Gas* that illustrates the analytical conflict between California's approach to the business income definition and the approach taken in the cases Jim Beam cites: " 'It is not the use of the property in the business which is the determining factor under the statute. *The*

*Inc. v. Tolson* (2001) 353 N.C. 659 [548 S.E.2d 513]; *Kemppel v. Zaino* (2001) 91 OhioSt.3d 420 [2001 Ohio 92, 746 N.E.2d 1073]; and *Laurel Pipe Line Co. v. Com.* (1994) 537 Pa. 205 [642 A.2d 472].

*controlling factor by which the statute identifies business income is the nature of the particular transaction giving rise to the income.* To be business income the transaction and activity must have been in the *regular course* of the taxpayer's business operations.' " (*McVean & Barlow, supra,* 543 P.2d at p. 491, quoting *Western Natural Gas, supra,* 446 P.2d at p. 783, italics added by *McVean & Barlow* court.) The other out-of-state cases all adopt a similar approach by focusing on whether the *disposition of the property,* as opposed to the income-producing property itself, constitutes an integral part of the taxpayer's regular trade or business.[5]

From our earlier discussion of *Hoechst Celanese,* it should be evident that such an approach is contrary to California decisional law, for it focuses on the nature of the transaction, rather than on the relationship between the property sold and the taxpayer's regular trade or business operations. (See *Hoechst Celanese, supra,* 25 Cal.4th at pp. 527, 530 [focus of functional test is on relationship between income-producing property and taxpayer's business operations; extraordinary nature of transaction is irrelevant]; see also *Triangle Publications, supra,* (1981–1984 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 400-905, at p. 23,346 [expressly rejecting *McVean & Barlow* and *Western Natural Gas*].) Acceptance of Jim Beam's argument would require us to apply the functional test in a manner inconsistent with *Hoechst Celanese* and the SBE decisions on which that case relied.[6]

Furthermore, as the FTB points out, and Jim Beam readily concedes, the holdings of these cases have been superseded by legislative enactment in at least five of the six states in question.[7] Although it acknowledges that most of the out-of-state cases it cites have been superseded by statute, Jim Beam

---

[5] (See *American States Insurance Co. v. Hamer, supra,* 816 N.E.2d 659 at pp. 667–668; *Blessing/White, Inc. v. Zehnder, supra,* 768 N.E.2d 332 at p. 343; *May Dept. Stores v. Dept. of State Revenue, supra,* 749 N.E.2d 651 at pp. 664–665; *Lenox, Inc. v. Tolson, supra,* 548 S.E.2d 513 at pp. 519–520; *Kemppel v. Zaino, supra,* 746 N.E.2d 1073 at pp. 1076–1077; *Laurel Pipe Line Co. v. Com., supra,* 642 A.2d 472 at pp. 475–477.)

[6] In *Hoechst Celanese,* the Supreme Court itself recognized that *McVean & Barlow* applied the principles of the transactional test while citing the language of the functional test. (*Hoechst Celanese, supra,* 25 Cal.4th at p. 522, fn. 6.) In fact, *Hoechst Celanese* declined to follow the North Carolina Supreme Court's opinion in *Union Carbide Corp. v. Offerman* (2000) 351 N.C. 310 [526 S.E.2d 167] precisely because that court improperly focused on the gain from the disposition rather than on the income-producing property. (*Hoechst Celanese, supra,* 25 Cal.4th at p. 537.)

[7] (See 35 Ill. Comp. Stat. Ann. 5/1501 (a)(1) [defining " 'business income' " as "all income that may be treated as apportionable business income under the Constitution of the United States"]; N.M. Stat. Ann. 7-4-2(A) [defining business income to include "income from the disposition or liquidation of a business or segment of a business"]; N.C. Gen. Stat. Ann. § 105-130.4(a)(1) [defining "apportionable income"]; Ohio Rev. Code Ann. § 5747.01(B) [" 'Business income' includes income, including gain or loss, from a partial or complete liquidation of a business, including, but not limited to, gain or loss from the sale or other

argues that our interpretation of section 25120, subdivision (a) should reflect the holdings of these cases rather than the policies adopted by the legislatures of our sister UDITPA states. According to Jim Beam, "the only way that Section 25120(a) would be consistent with the statutes in these states [that have amended their definition of business income] is if the California law, too, was amended." We reject this argument because in *Hoechst Celanese* our Supreme Court noted that the objective of UDITPA is " 'to promote uniformity in allocation *practices*.' " (*Hoechst Celanese, supra,* 25 Cal.4th at p. 518, italics added.) Indeed, in *Hoechst Celanese,* the Supreme Court did precisely what Jim Beam contends we may not do—it adopted a construction of the statute consistent with the amendments adopted by legislatures in other states and rejected judicial decisions that had refused to recognize the functional test. (*Id.* at p. 526.)

Finally, we point out that our position on this issue follows the regulations drafted by the Multistate Tax Commission.[8] Those regulations provide that "[i]ncome that is derived from . . . transactions made in liquidation or the winding-up of business, is business income, if the property is or was used in the taxpayer's trade or business operations." (MTC Reg. IV.1.(a)(5)(B).) These regulations strengthen our conclusion that our view of the issue is better suited to achieve the uniformity that is the objective of UDITPA than is Jim Beam's. (See Rev. & Tax. Code, § 25138.)

We therefore conclude that the gain from the sale of the stock of Taylor Food is properly considered business income within the meaning of Revenue and Taxation Code section 25120, subdivision (a). As a result, the trial court properly granted summary judgment to the FTB on Jim Beam's first cause of action.

## II.

### THE ADJUSTMENT TO BASIS

Having concluded that the gain from the sale of the stock of Taylor Food was business income, we turn to Jim Beam's contention that it was entitled to reduce its gain on the sale of the stock by adjusting its basis to reflect certain undistributed earnings and profits. Jim Beam sought this basis adjustment in

---

disposition of goodwill"]; 72 Pa. Stat. Ann., tit. 72, § 7401 (3)2(a)(1)(A) [business income "includes all income which is apportionable under the Constitution of the United States"].)

[8] The Multistate Tax Commission was created by the Multistate Tax Compact, which California adopted in 1974. (Rev. & Tax. Code, §§ 38001, 38006, art. VI.) Among the commission's powers is that of adopting uniform regulations. (*Citicorp, supra,* 83 Cal.App.4th at p. 1417, fn. 14, citing Rev. & Tax. Code, § 38006, art. VI.)

its second cause of action below. Jim Beam contended that such a basis adjustment is proper because these undistributed earnings have already been taxed by California. The trial court disagreed and granted summary judgment to the FTB on this cause of action. We disagree with Jim Beam and conclude that the trial court properly granted summary judgment.

As a general rule, the basis of property is the cost of that property. (Rev. & Tax. Code, § 24912.) The Revenue and Taxation Code does permit various adjustments to basis, but we are aware of no provision granting an adjustment to basis because of undistributed corporate earnings and profits. In fact, Jim Beam cites no statute that would permit the basis adjustment it seeks. It relies instead on what it claims is one of the "major policies" of corporate taxation—that corporate income should not be taxed more than once at the corporate level. It claims that this principle is embodied in Revenue and Taxation Code section 24402. But that section deals with the deduction of dividends received by one corporation from another corporation which it owns. (See Rev. & Tax. Code, § 24402, subd. (b).) Jim Beam also cites FTB Legal Ruling No. 376, but that ruling, too, deals with statutes governing the taxation of intercompany dividends, not with the taxation of income realized from the sale of the subsidiary of a unitary business.

As the FTB correctly argues, the SBE has previously rejected the very same argument Jim Beam makes here. In *Appeal of Rapid-American Corporation* (May 8, 1997) (1995–1999 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 402-934, p. 28,867, the SBE held that a taxpayer corporation that sold its stock in its unitary subsidiaries was not entitled to increase its basis in the stock by the amount of earnings and profits held in the subsidiaries that had previously been reported to California on the taxpayer's combined unitary report. (*Id.* at p. 28,868.) As the SBE explained, "[i]f the subsidiary did not distribute its earnings and profits as a dividend to the parent, California would tax the income of the subsidiary, and would also tax a subsequent capital gain realized by the parent on a sale of the subsidiary." (*Ibid.*) The SBE concluded that "there is no statutory, regulatory or case law basis in California to support an adjustment upward in the basis of stock on account of undistributed earnings and profits, even if those earnings and profits have been included in a combined unitary report." (*Id.* at p. 28,869; see also *Appeal of CRG Holdings, Inc.* (May 8, 1997) (1995–1999 Transfer Binder) Cal. Tax Rptr. (CCH) ¶ 402-933, pp. 28,865–28,867 [rejecting double taxation argument].)

In the absence of any controlling statute or regulation permitting the adjustment to basis that Jim Beam requests, we conclude that the trial court did not err in granting summary judgment to the FTB on Jim Beam's second cause of action.

## DISPOSITION

The trial court's grant of summary judgment is affirmed.[9]

Rivera, J., and Munter, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied January 4, 2006, S139031.

---

[9] On February 15, 2005, we granted the FTB's first request for judicial notice without making any determination regarding the relevance of the documents of which judicial notice was requested. We have reviewed the documents attached to the FTB's first request, but save for those cited in this opinion, we conclude that they "were not useful in the analysis of the issues raised on appeal." (*Citicorp, supra,* 83 Cal.App.4th at p. 1433, fn. 26.) We deny the FTB's second request for judicial notice.

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.